[No. F045698. Fifth Dist. Sept. 21, 2004.]

FRESNO COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Petitioner, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
LILY G. et al., Real Parties in Interest.

628

COUNSEL

Phillip S. Cronin, County Counsel, and Howard K. Watkins, Deputy County Counsel, for Petitioner.

Kimball Sargeant, under appointment by the Court of Appeal, for Real Party in Interest Lily G.

John L. Dodd, under appointment by the Court of Appeal, for Real Party in Interest Rhiannon H.

OPINION

**VARTABEDIAN, Acting P. J.**—In March 2004, respondent Fresno County Superior Court, sitting as a juvenile court, terminated parental rights to half sisters, one-year-old Rhiannon and three-year-old Lily. Rhiannon is an Indian child within the meaning of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.; ICWA); she is eligible for membership in the federally recognized Cold Springs Rancheria of the Mono Indians (tribe). Lily, although also of Native American descent, is not an Indian child under ICWA. While termination was undisputed at the March proceedings, the children's placement was hotly contested. The tribe, joined by Fresno County Department of Children and Family Services (the department) and the children's mother, petitioned the juvenile court to place the children with an Indian family, selected by the tribe in accordance with ICWA's placement

preference (25 U.S.C. § 1915) and approved by the department.[1] The children's attorney objected, claiming there was "good cause" under ICWA not to follow the placement preference. Following an evidentiary hearing, the juvenile court agreed with the children's attorney and denied the tribe's petition. The court further ordered that if the department thereafter wished to exercise its discretion to change the children's placement, it must first explain to the court why the change would not be a gross violation of its discretion.

The department appealed. (Welf. & Inst. Code, § 395.)[2] It thereafter filed a petition for writ of mandamus in order to expedite review of its appellate claims and elected to proceed by writ petition rather than appeal. According to the department, the juvenile court erroneously found "good cause" to overcome ICWA's placement preference. The department also contests the court's order regarding the exercise of the department's posttermination placement discretion as an improper invasion of its discretion and improper shifting of the burden of proof. Attorneys for the children as real parties in interest assert that the court properly found good cause and did not infringe on the department's placement discretion. On review of the merits, we conclude the juvenile court acted properly and will deny writ relief.

■ With regard to "good cause," we hold ICWA neither expressly nor impliedly restricts the superior court in its good cause evaluation to the considerations contained in federal guidelines. Rather, Congress explicitly intended to provide state courts with flexibility in determining the placement of an Indian child. Due to the importance ICWA attaches to its placement preference, we further hold any party claiming a good cause exception to the placement preference bears the burden of proof and a good cause finding is subject to a substantial evidence standard of review. As to the juvenile court's

---

[1] 25 United States Code section 1915 provides in pertinent part:

"(a) . . . In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

"(b) . . . Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

"(i) a member of the Indian child's extended family;

"(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

"(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

"(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs."

[2] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

order regarding the exercise of the department's posttermination placement discretion, we hold under section 366.3, the department still bore the burden of establishing the appropriateness of the children's posttermination placement.

## PROCEDURAL AND FACTUAL HISTORY

In late January 2003, Christopher H. inflicted serious physical harm on his seven-month-old daughter, Rhiannon. The child sustained injuries consistent with shaken baby syndrome, including a skull fracture, cerebral edema, brain and retinal hemorrhages, significant seizure activity, and bruising. The mother reasonably should have known her daughters were at risk of serious harm in Christopher H.'s care due to his violent history and ongoing substance abuse. For her part, the mother also had a substance abuse problem that contributed to her inability to adequately protect her children. The couple's ongoing domestic violence further exposed the children to an unsafe environment.

Due to the serious nature of her injuries, Rhiannon was hospitalized for approximately one month. In the meantime, the department initiated dependency proceedings (§ 300, subds. (a) & (b)) as to Rhiannon and later also as to her 21-month-old half sister Lily. Although the mother left Lily with a maternal relative when Rhiannon's injuries came to light, the department intervened when that relative tested positive for drugs. The department placed Lily in foster care. A few days later, upon Rhiannon's hospital release, the department placed her in the same foster home with Lily. The two girls have lived there ever since. The foster family is not of Native American heritage.

In March 2003, the juvenile court declared Rhiannon an Indian child entitled to ICWA protection. The tribe, of which Christopher H. was a member, had requested notice of and recognition in the dependency proceedings as to Rhiannon. The court would later determine that ICWA did not apply to Lily. She is a San Gabriel Mission Indian (Tongva Tribe) which is not federally recognized.

The juvenile court exercised its dependency jurisdiction over Rhiannon and Lily in late April 2003. At the time, the department was investigating and the tribe supported Rhiannon's paternal grandparents as a prospective placement for both children. However, due to Rhiannon's medically fragile state, her need for one-on-one care, and the girls' sibling attachment, a court-appointed special advocate recommended and the court ordered that the children remain in their current placement.

In late May 2003, the juvenile court conducted its dispositional hearing which representatives of the tribe, in addition to counsel for the other parties,

attended. The court adjudged both Rhiannon and Lily dependent children, removed them from parental custody and denied reunification services to the mother and Rhiannon's father (§ 361.5, subd. (b)(5) & (6)) as well as to Lily's alleged father (§ 361.5, subd. (a)). It in turn set a section 366.26 hearing for October 1, 2003 to select and implement a permanent plan for the children.

On the issue of placement, one of the tribe's representatives proffered its council's May 2003 formal resolution stating that Rhiannon should be placed with the paternal grandmother. If the paternal grandmother was not selected, the resolution stated that the tribal council had established a priority list of extended family members. That priority list was neither made a part of the resolution, nor were its contents disclosed on the record. County counsel, on the department's behalf, sought to clarify that Rhiannon's medical condition prevented "any quick move" on relative placement under ICWA. Counsel also acknowledged "this may very well be a case where it is appropriate to veer from [the ICWA] placement preference." The juvenile court added if the department's eventual placement recommendation were not according to the ICWA preference, the tribe would have the right to try the issue. The court also gave the department discretion to change the children's placement upon 10 days' notice as a result of the "disability of the minor."

As it turned out, the department did not approve the paternal grandmother for placement. Among the reasons cited were her disbelief that her son could harm Rhiannon and that Rhiannon had actually suffered the diagnosed injuries. The department next assessed other immediate paternal relatives before pursuing extended family members interested in placement. The immediate relatives, however, as the court would later remark, were not "passing live scans."

In mid-September 2003, Sheila E., a tribal council member whose husband by tribal custom and tradition was Rhiannon's third or fourth cousin, requested placement of Rhiannon and Lily. The department immediately sent Mrs. E. the criminal background check documentation to begin a placement evaluation. Although the E. family had been approved for some time to care for Native American foster children in another county, they had to be reassessed by the department because "the information utilized by one county can not use [sic] by another county for these types of assessments."

It was against this backdrop that the department prepared its original adoption assessment and recommendation for the October 1st section 366.26 hearing. The department reported it was likely the children would be adopted if parental rights were terminated. Moreover, a preliminary evaluation showed the children's foster parents of approximately seven months were suitable and

committed to adopting them. At that point, the children's foster parents constituted the only family whom the department found eligible to adopt Rhiannon and Lily.

As of October 1st, the department had been unable to locate the mother for notice purposes. Because her whereabouts were unknown, a 90-day continuance of the section 366.26 hearing to early January 2004 was necessary in order to publish notice.

In the meantime, Lily was exhibiting signs of stress requiring mental health treatment. Following her initial detention in February 2003, Lily, both passively and actively, resisted following rules and suffered night terrors. She also masturbated at times, reporting that her stepfather did this to her. Consistent parenting by the foster parents and a tapering off of family visits appeared to help Lily's behavior. Then, following a visit with Rhiannon's paternal grandmother in October 2003, Lily again had night terrors, displayed renewed oppositional behaviors, and masturbated. The oppositional behaviors included "anger, defensiveness, bad mouthing others and yelling." She began weekly therapy in November. Lily's therapist reportedly described the child as exhibiting behaviors suggestive of sexual abuse. Although Lily continued to struggle with managing her feelings and behaviors, she did show improvement through therapy.

At the continued section 366.26 hearing in January 2004, the department requested yet another continuance, which the juvenile court granted. The department reported it needed more time to submit expert testimony required under ICWA. At the January proceeding, Mrs. E. also identified herself as having been approved to "take the girls." A tribal representative explained the tribe currently recommended that at least Rhiannon be placed with the E. family. As the representative explained, "we did get one family [Mr. and Mrs. E.] who has passed everything: The home inspection, the background and everything."[3] The court acknowledged the preference for a placement within the tribe but stated its reluctance to disrupt the children's placement given that they had been in the same home for close to a year and the risk of attachment disorder. The tribal representative argued the children were young enough to start a bond with another family. The court granted a request by the children's attorney that they not be moved without further order of the court.

Apparently unbeknownst to the juvenile court and minors' counsel, the department had already begun discussions with the tribe for transitioning the children to the E. home. Following the January hearing, the department

---

[3] According to evidence later introduced, the department determined in mid-December 2003 that the E. family was eligible for placement of Rhiannon and Lily.

prepared to implement its transition plan of introducing the children to Mr. and Mrs. E. through supervised visitation and gradually increasing their contact towards a goal of placing the children with the E. family.

Having learned of the department's plan, minors' counsel brought a successful ex parte motion to prohibit the introductory visits pending the section 366.26 trial. In response, the tribe moved to formally intervene in the dependency proceedings and vacate the ex parte order for lack of notice. It also petitioned (§ 388) to immediately start regular visitation with the E. family towards a goal of placing both girls or at least Rhiannon with them.

For its part, the department lodged an addendum report dated February 18, 2004, identifying Mr. and Mrs. E. as the children's prospective adoptive parents and describing the favorable results of the department's preliminary assessment of the couple. Also, according to the addendum report, it was in the children's best interest to reside in the same home. They appeared to share a significant bond; separating them would be severely detrimental to the emotional and psychological well-being of both children.

Attached to the department's addendum report was a declaration of ICWA expert and social worker, Morning Star Myers. In Myers's professional opinion, reasonable and active efforts had been provided to the parents, return of the children to parental custody would create a substantial risk of detriment to their safety, and a permanent plan of adoption would be in the children's best interests. Myers concluded by further recommending both children be transitioned over a 90-day period for placement purposes to the identified tribal home. She, however, did not explain the basis for her placement recommendation.

Also attached to the February 18 addendum report was a letter from Rhiannon's pediatric neurologist, Dr. Steven Ehrreich. According to Dr. Ehrreich, although Rhiannon made excellent developmental progress since her initial placement with her foster parents, her long-term neurological prognosis was currently guarded. He added it would be in her best interest to continue to receive the consistent care and medical follow-through that was being provided in her current foster home.

A February 2004 letter from Lily's therapist was also attached. In it, the therapist described "extreme and inappropriate behaviors" on Lily's part before the start of therapy and the success she had achieved in significantly decreasing those behaviors and symptoms. The therapist credited the "decrease to Lily's stable environment, teaching and reinforcing appropriate behaviors." It was the therapist's belief that if Lily were to be removed from her current home, "it would be detrimental, upsetting, and thus additional stress, adjustment and probable return of her symptoms."

At a February 18, 2004 hearing, the juvenile court granted the tribe's requests to intervene and vacate the no-visitation order. On the tribe's section 388 petition, the department and the mother's counsel requested the relief sought by the tribe be issued not only on behalf of Rhiannon, but also as to Lily because the two were to be adopted as a sibling group. Counsel for the tribe later expressly stated there was no objection to amending the section 388 petition to include Lily.

The children's attorney requested the court continue any hearing on the tribe's petition pending an attachment assessment of both children with the current care providers. The children's attorney cited the recent letter from Lily's therapist. Counsel for the tribe objected, citing ICWA, noting the therapist was not speaking as to Rhiannon, and claiming the children did not have any attachment disorder and could easily form healthy attachments to other care providers.

The juvenile court permitted a supervised visit between the children and Mr. and Mrs. E. pending the next hearing date. It also authorized the attachment study of the children and their current care providers as well as between the children. It further agreed with the department that the attachment study should address whether a transition would be detrimental to the children in terms of an attachment disorder.

In yet another addendum report filed in February 2004, the department detailed a positive visit between the children and Mrs. E. that occurred February 20th. However, when a department social worker contacted the foster mother three days later regarding the children's behavior after the visit, the foster mother stated both children had night terrors and had been very clingy. Attached to the latest addendum report was a memorandum from a marriage family therapist/social worker describing in greater detail the children's recent behavior. Following the February 20th visit, Lily exhibited anxiety through regression on earlier toilet training issues and masturbation. Her sleep pattern was also briefly disrupted. She was angry, disrespectful and defiant. She also broke out in hives after the visit and displayed clingy behaviors. Lily broke out in hives once before following a home visit in January by the ICWA specialist. Lily was able to tell her foster mother she felt sad and did not want to leave the foster home. As for Rhiannon, she had not previously shown any obvious symptoms of distress or anxiety. However, after the January visit of the ICWA specialist, she suffered "significant night terrors" and was currently showing more clingy behaviors and a repeat of the night terrors.

According to an attached department narrative, the family therapist/social worker and the department's social worker drew conflicting inferences about

the children's reactions. The department's social worker was under the impression the girls had a similar anxiety reaction to all strangers. The marriage family therapist/social worker disagreed, stating the girls were only reacting to those persons who were from prospective placements.

The court authorized another visit between the children and the E. family pending receipt of the assessment and further hearing. That second visit occurred February 26 and, according to a subsequent department narrative of it, was positive.

In early March, Michael Healy, a licensed marriage and family therapist, submitted his written bonding study of both children and their foster parents. In his report, Healy described an interaction method that he used to observe the interactions between the foster parents and the children as well as his actual observations. He concluded with his opinions that the children had a healthy attachment towards their foster parents and shared a positive parent-child relationship and the children would be greatly harmed if this relationship would be terminated. Due to an oversight in the department's referral to Healy, the therapist was not asked to address and therefore did not comment on the sibling relationship.[4]

At a March 10th hearing, the juvenile court acknowledged receiving Healy's report. The department sought a supplemental report to address whether the transition it proposed would be detrimental as well as to address the sibling relationship. The court responded it was not inclined to order continued visitation between the children and the E. family. The tribe argued Healy's report did not rise to the level of good cause under ICWA to deviate from the placement preference. The children's attorney objected to a supplemental report and requested a no-movement order without further hearing. She then voiced a concern that if the parties proceeded with the section 366.26 hearing and the court terminated parental rights, the department could "just move them."

County counsel replied: "the Department's position is that if and when the Court terminates parental rights, it does place the child in the exclusive care, custody and control of the Department for selection of an adoptive placement, and at that time the Department would have the authority to make the placement decision."

She added: "I think the Court needs to think long and hard about what's happening here, because the Department's reasoned decision as an adoptive agency is that the children should be adopted by Mr. and Mrs. [E.]."

---

[4] Contrary to the department's claim and insinuation at oral argument, the juvenile court did not order Healy to address the sibling bond and thus the therapist was not somehow at fault for not discussing the sibling bond.

In response, the court sought to clarify the department's stance: "You are essentially saying, after the .26, whatever this Court says, no matter what my order, the Department is going to do what they want to do?"

After renewing her claim that the department had a reasoned adoptive analysis, county counsel conceded "[i]f you want to read it with that kind of spin on it, yes, Your Honor." County counsel also pointed out the department would pursue its transition plan as long as it did not appear over the course of time to be detrimental to the children.

Following further debate, the court confirmed the case for trial and ordered Healy's presence. The juvenile court finally conducted the contested hearing on March 25, 2004.

At the March 25th hearing, the court placed the burden of proof on the children's counsel to contest the placement preference, proposed by the tribe in its section 388 petition and endorsed by the department and the mother. When the children's counsel replied she was satisfied with Healy's report, the court stated it had some questions and commenced its own examination of the report's author.[5]

Healy testified the children and the foster parents shared a healthy attachment. He rejected a notion urged by the department that the children's attachment was an anxious one. He added that in light of the neglect and abuse to which the children were previously exposed, their healthy attachment to the foster parents was "very critical" to their well-being. If pulled away from that healthy attachment, it would create psychological problems for each child. In this regard, Healy disagreed with the department's position that the fact there was a healthy attachment would increase the children's ability to form another healthy attachment if they were placed in a different home.

Lily in particular was at a high risk of developing an attachment disorder due to the symptoms of posttraumatic stress she displayed. To remove Lily would exacerbate her posttraumatic symptoms and could affect her relationships with whomever the new caretaker was. "It is a matter of not being able to trust that person." As the court questioned Healy about these risks in the short term, the therapist volunteered he had "a hard time separating long-term from short-term. I think it can continue. I don't see it, like, just, you know, three or six months of this. I could see it happening for quite some time those symptoms, because she is already—is exhibiting those [symptoms]."

---

[5] Contrary to yet another claim made at oral argument, the record does not reveal that the court placed the burden of proof on the department or the tribe.

On the subject of transitioning the children over a period of months to another placement, Healy testified consistency was more important to reducing the trauma involved. The more consistent contact the children had with their current care providers the less likely it was they would experience trauma. The therapist cited two examples of more consistent contact. The first would be where a child has a healthy attachment with two parents and one parent leaves that child's life; the child would still have the remaining parent and could most likely have an easier time adjusting because they have some consistency. As a second example, Healy hypothesized if the foster parents "were to be sort of a visiting or noncustodial parent." The important element was that the children not be totally removed from the one or two persons, in this case, the foster parents, with whom they had a primary attachment which Healy characterized as the "most important."

In addition, there was a high probability that even with a transition plan in effect, Lily would develop an attachment disorder. Although it was possible for some children to transition from one healthy attachment to another over a period of time, in Lily's case, her posttraumatic stress symptoms indicated she would not be able to transition. Healy concluded his testimony by citing a recent example leading him to believe Lily was still traumatized. The day before, Lily drew a picture of a man pointing a gun at her as she was lying on the floor surrounded by blood. Healy's impression was the man was either the child's father or the mother's boyfriend.

In closing argument on its petition, the tribe asked the court to follow both ICWA and California relative placement preferences and place the children with the E. family.[6] After the matter was submitted, the court denied the tribe's section 388 petition. It found that in the case of Lily, she had extraordinary emotional needs and her high risk of an attachment disorder amounted to good cause and therefore an exception to following the ICWA placement preference. As to Rhiannon, the court found conflicting preferences, on the one hand, a state preference for maintaining a sibling relationship and, on the other hand, the ICWA placement preference, and observed it was not willing to separate the two children.

The juvenile court next proceeded to the issue of permanent planning. It was undisputed the children were adoptable. However, the children's attorney once again expressed her concern that assuming the court terminated parental rights, it should admonish the department that were it to move the children for adoption placement, the court would find an abuse of discretion based on the lengthy trial that had just concluded. Recalling its earlier debate with county counsel, the court agreed. Following additional argument by the

---

[6] Counsel for the tribe asked the court to follow the spirit of ICWA and treat Lily as an Indian child even though her tribe was not federally recognized.

department and the tribe against such an admonition, the court ruled that if the department wished to exercise its discretion to move the children, it would need to show why that would not necessarily be a gross violation of its discretion. The court then made the requisite findings under ICWA to terminate parental rights.

## DISCUSSION

### Good Cause Exception

As mentioned at the outset, the department challenges the juvenile court's "good cause" finding to overcome ICWA's placement preference. The department contends ICWA recognizes only limited criteria for a good cause determination, none of which existed in this case. It further argues the court erred, among other reasons, because it purportedly did not consider the department's transition plan for changing the children's placement.

ICWA establishes minimum federal standards, both procedural and substantive, governing the removal of Indian children from their families. (*In re Alicia S.* (1998) 65 Cal.App.4th 79, 81 [76 Cal.Rptr.2d 121].) The most important substantive requirement imposed on state courts is that of 25 United States Code section 1915(a), which, absent "good cause" to the contrary, mandates that adoptive placements be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indians families. (*Mississippi Choctaw Indian Band v. Holyfield* (1989) 490 U.S. 30, 36 [104 L.Ed.2d 29, 109 S.Ct. 1597].) 25 United States Code section 1915(b) states a similar preference for any Indian child accepted for foster care or preadoptive placement, in the absence of good cause to the contrary. In this way, ICWA seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society. (*Mississippi Choctaw Indian Band v. Holyfield, supra,* 490 U.S. at p. 37.)

Although Congress defined numerous terms for ICWA purposes at the outset of the act (see 25 U.S.C. § 1903 ), it did not define the phrase "good cause" as used in 25 United States Code section 1915 (Section 1915). Nevertheless, according to ICWA's legislative history, Congress, by its use of the term "good cause," explicitly intended to provide state courts with flexibility in determining the placement of an Indian child. (*In re Alicia S., supra,* 65 Cal.App.4th at p. 89; *In re Robert T.* (1988) 200 Cal.App.3d 657, 663 [246 Cal.Rptr. 168].)

### Federal Guidelines

Despite Congress's intentional decision not to define good cause, the department contends federal guidelines and state rules of court establish

limited criteria for a good cause determination that did not exist in this case. Specifically, the department cites section F.3 of Department of the Interior, Bureau of Indian Affairs Guidelines for State Courts; Indian Child Custody Proceedings (44 Fed.Reg. 67584 (Nov. 26, 1979); hereafter Guidelines) and rule 1439 (k)(4) of the California Rules of Court.

Section F.3 of the Guidelines states: "(a) For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference set out above *shall* be based on one or more of the following considerations:

"(i) The request of the biological parents or the child when the child is of sufficient age.

"(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

"(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria." (Italics added.)

California Rules of Court, rule 1439 (k)(4) sets forth the identical considerations as the Guidelines for a good cause determination but distinguishes itself from the Guidelines in that the rule does not restrict the court to only those considerations, i.e., "[t]he court may modify the preference order only for good cause, which *may* include the following considerations. . . ." (Cal. Rules of Court, rule 1439(k), italics added.)

As alluded to earlier, the juvenile court made an effort to apply these considerations by finding Lily had extraordinary emotional needs based on therapist Healy's testimony. The department nevertheless takes exception to the court's finding as incomplete because there was no independent good cause shown under the Guidelines and the rule of court as to Rhiannon. Given the distinction between the Guidelines' use of mandatory language and the rule of court's use of permissive language, however, it appears the department's more precise argument is the juvenile court erred because it had to find good cause as to Rhiannon within the limited considerations set by the Guidelines. We disagree with the department's premise and conclude there was no legal error in this regard.

First, the Guidelines are not binding on state courts. (Guidelines, Introduction, *supra*, 44 Fed.Reg. 67584; *In re Michael G.* (1998) 63 Cal.App.4th 700, 714 [74 Cal.Rptr.2d 642].) As the Department of the Interior explained in its Introduction, the Guidelines were "not intended to

have binding legislative effect. Many of these guidelines represent the interpretation of the Interior Department of certain provision of the Act." (Guidelines, Introduction, *supra* , 44 Fed.Reg. 67584.)

■ Second, the courts, not the Interior Department, have the primary responsibility for interpreting "good cause" as used in Section 1915. Thus, section F.3 of the Guidelines should be given important but not controlling significance. (Guidelines, Introduction, *supra*, 44 Fed.Reg. 67584, citing *Batterton v. Francis* (1977) 432 U.S. 416, 424–425 [53 L.Ed.2d 448, 97 S.Ct. 2399].) In its Introduction, the Interior Department acknowledged that some portions of ICWA expressly delegated to the Secretary of the Interior responsibility for interpreting statutory language while "primary responsibility for interpreting other language used in the Act, however, rests with the courts that decide Indian child custody cases." (Guidelines, Introduction, *supra*, 44 Fed.Reg. 67584.) Notably, as an example of language the courts have the primary responsibility for interpreting, the Introduction cited the term "good cause" as used in section 1915. (Guidelines, Introduction, *supra*, 44 Fed.Reg. 67584.) In other words, section F.3 of the Guidelines is the Interior Department's considered opinion and recommendation, not a mandate to state courts. As the Interior Department further noted, courts "are free to act contrary to what the Department has said if they are convinced that the Department's guidelines are not required by the statute itself." (Guidelines, Introduction, *supra*, 44 Fed.Reg. 67584.) Under these circumstances, we are not persuaded by the department's reliance on *In the Matter of C.H.* (2000) 299 Mont. 62 [997 P.2d 776] in which the Montana Supreme Court strictly applied section F.3 of the Guidelines as though it was mandatory.

■ Third, because Congress explicitly intended to provide state courts with flexibility in determining the placement of an Indian child (*In re Alicia S., supra,* 65 Cal.App.4th at p. 89; *In re Robert T., supra,* 200 Cal.App.3d at p. 663), we conclude ICWA neither expressly nor impliedly restricts the superior court in its good cause evaluation to the three considerations contained in section F.3 of the Guidelines. In this regard, we endorse the position expressed in California Rules of Court, rule 1439(k) that a court's good cause determination to overcome ICWA's placement preference "*may* include the . . . considerations [contained in the Guidelines]." (Italics added.)

### Standard of Review

The children contend we should review the juvenile court's good cause finding for abuse of discretion because that decision was in fact a denial of

the tribe's section 388 petition to change their placement.[7] Counsel for the children rely on settled California law that section 388 rulings, as well as custody rulings in general, are matters calling for the juvenile court's exercise of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 [27 Cal.Rptr.2d 595, 867 P.2d 706].) The department does not directly dispute abuse of discretion as the appropriate standard.

■ The children's approach to the standard of review issue appears overly simplistic. Yes, the tribe did pursue a section 388 petition to change the children's placement, and appellate courts routinely review the ruling on such a petition for abuse of discretion. However, even the juvenile court recognized that this was not an ordinary section 388 proceeding in which the petitioning party bears the burden of proof (see *In re Audrey D.* (1979) 100 Cal.App.3d 34, 43 [160 Cal.Rptr. 802]). The tribe's request to change the placement was based on ICWA and its preference for placement with an Indian family. As previously noted, the court appropriately placed the burden on the children's counsel to establish good cause not to follow the preference. Thus, the more accurate question is how should this court review a good cause determination to overcome ICWA's placement preference. On review, it appears the substantial evidence test is a more appropriate standard to apply in reviewing the juvenile court's good cause determination.

In *In re Alicia S., supra,* 65 Cal.App.4th at page 88, this court indirectly referenced but did not resolve the standard of review question. At issue was the "existing Indian family doctrine" by which some courts refused to apply ICWA unless an Indian child was "being removed from an 'existing Indian family,' meaning generally a family with a significant connection to the Indian community" (*id.* at p. 83). We observed that Section 1915 permitted a court to depart from the statutory preferences where good cause existed to do so and thus courts applying the "existing Indian family doctrine" could reach the same result without having to rely on a judicially created exception to ICWA that appeared nowhere in the act itself. (*In re Alicia S., supra,* 65 Cal.App.4th at pp. 88–89.)

In the course of our discussion, we noted that, without an ICWA definition of good cause, published decisions had given the term somewhat varying interpretations. (*In re Alicia S., supra,* 65 Cal.App.4th at p. 88 [76 Cal.Rptr.2d 121].) Summarizing one of those decisions, *Matter of Adoption of F.H.* (Alaska 1993) 851 P.2d 1361, 1363–1364, we mentioned the sister-state court affirmed a good cause finding after acknowledging such a determination was within the superior court's discretion. (*In re Alicia S.,*

---

[7] Under section 388, a party may petition to modify a prior dependency court order on grounds of change of circumstance or new evidence. (§ 388, subd. (a).) The petitioning party must also show that the proposed change would promote the best interests of the child. (§ 388, subd. (b).)

*supra,* 65 Cal.App.4th at p. 88.)[8] As the issue was not before us, we did not hold that a good cause finding was subject to an abuse of discretion standard of review.

■ Both the abuse of discretion test and the substantial evidence test entail considerable deference to the factfinding tribunal. (*Pack v. Kings County Human Services Agency* (2001) 89 Cal.App.4th 821, 838 [107 Cal.Rptr.2d 594].) The former centers upon legal principles—whether, in light of the record, the trial court's ruling falls within the permissible range of options set by the legal criteria—while the latter centers upon evidentiary proof—whether the trial court's factual conclusions are rationally supported by record evidence. (*Ibid.*)

■ Given the prime importance under ICWA of placement of an Indian child with an Indian family (*Mississippi Choctaw Indian Band v. Holyfield, supra,* 490 U.S. at p. 36), a court's finding of good cause does not appear based in an exercise of discretion. ICWA in this regard does not contemplate a balancing of various competing interests (*Pack v. Kings County Human Services Agency, supra,* 89 Cal.App.4th at p. 840). Rather, a court's finding of good cause amounts to an exception to the rule preferring placement of an Indian child with an Indian family. Thus, it is not akin to a traditional custody decision under California law in which a court balances competing claims. (*In re Stephanie M., supra,* 7 Cal.4th at p. 318.) Indeed, according to the congressional declaration of policy at the outset of ICWA (25 U.S.C. § 1902), ICWA is designed to protect the best interests of Indian children.

"The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.)

Based on the foregoing, application of a substantial evidence standard to a good cause determination under section 1915 appears consistent with and better protects the importance ICWA places on an Indian family placement (*Pack v. Kings County Human Services Agency, supra,* 89 Cal.App.4th at p. 840). Review on the basis of substantial evidence would ensure that a court's good cause finding to overcome ICWA's preference will be rigorously tested against the record. (*Ibid.*)

---

[8] Other sister-state decisions mentioned in our discussion also resorted to an abuse of discretion standard.

■ Thus, we will apply to the juvenile court's good cause finding the substantial evidence standard of review, which provides in juvenile dependency cases that the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379 [97 Cal.Rptr.2d 746].) All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the decision, if possible. We may not reweigh or express an independent judgment on the evidence. (*In re Laura F.* (1983) 33 Cal.3d 826, 833 [191 Cal.Rptr. 464, 662 P.2d 922].) In this regard, issues of fact and credibility are matters for the trial court alone. (*In re Amy M.* (1991) 232 Cal.App.3d 849, 859–860 [283 Cal.Rptr. 788].)

### *Substantial Evidence of Good Cause*

The department's argument in this regard appears to be little more than a concerted effort to have this court reweigh the evidence presented, something we may not do. (*In re Laura F., supra,* 33 Cal.3d at p. 833.) Our review of the record, as summarized above, discloses substantial evidence supporting the juvenile court's good cause finding to overcome ICWA's preference for placement of the children with an Indian family.

### A.

The department first argues against the existence of a sibling relationship as a factor in determining good cause under ICWA. We disagree.

■ The fact that ICWA makes no mention of a sibling exception to its placement preference is not persuasive. As we previously observed, Congress by its use of the term "good cause" explicitly intended to provide state courts with flexibility in determining the placement of an Indian child. (*In re Alicia S., supra,* 65 Cal.App.4th at p. 89; *In re Robert T.* (1988) 200 Cal.App.3d 657, 663 [246 Cal.Rptr. 168].) In addition, California dependency law recognizes that in order to preserve and strengthen family ties when siblings have to be removed, they should be placed together unless it would not be in the best interest of one or more of the siblings. (§ 16002.) Our state's interest in preserving sibling relationships to the extent possible appears neither to interfere nor to be incompatible with federal and tribal interests; ICWA does not preempt the court's consideration of a sibling relationship in evaluating good cause. (See *New Mexico v. Mescalero Apache Tribe* (1983) 462 U.S. 324, 334 [76 L.Ed.2d 611, 103 S.Ct. 2378].)

Here, there was evidence, submitted by the department itself, that separating Rhiannon and Lily would be detrimental to them. As early as April 2003,

the record reveals the girls shared a sibling attachment. Later, as the department reported in one of its many 2004 addendum reports, it was in the children's best interest to reside in the same home. They appeared to share a significant bond; separating them would be severely detrimental to the emotional and psychological well-being of both children.

To the extent the department contends the juvenile court subordinated Rhiannon's needs to Lily's, it once again overlooked those portions of the record that supported the court's decision. First, Lily was not the only one exhibiting signs of stress. Since the visit of the ICWA specialist, Rhiannon suffered significant night terrors and displayed more clingy behaviors of late. Second, in light of the neglect and abuse to which each child was exposed, Rhiannon's as well as Lily's healthy attachment to their foster parents was "very critical" to the girls' well-being. Third, to separate the children from their foster parents would create psychological problems for both children and pose great harm. Fourth, according to Rhiannon's neurologist, the child's long-term neurological prognosis remained guarded and it was in her best interests to continue receiving the consistent care and medical follow-through that her foster parents provided.

Lost in the department's rhetoric is the fact that this case revolves around two very young children, each having special needs and each attached to the other. Notwithstanding the importance of the ICWA placement preference, each child's special needs, coupled with the detriment posed by either removing the children from their primary attachment or separating them, supported the juvenile court's good-cause determination.

### B.

The department also chastises the juvenile court for allegedly not taking into consideration the plan developed by the department for transitioning the children to the E. home. According to the department, there was no evidence that its transition plan would be detrimental to either child. At oral argument, the department reiterated its claim that Healy never testified against its transition plan. On review, we disagree with the department's characterization of the record.

The department ignores Healy's testimony that consistency was more important to Rhiannon and Lily than a gradual transition. In this regard, both the juvenile court and county counsel stated for the record, while Healy was on the stand, the terms of the proposed transition. According to Healy, the more consistent contact the children had with their current care providers, the less likely they would experience trauma. The therapist cited examples of more consistent contact, which were contrary to the department's plan.

Further, according to Healy, the important element was that the children not be totally removed from the one or two persons, in this case, the foster parents, with whom they had formed a primary attachment.

Also, Healy testified there was a "high probability" that even with a gradual transition plan, Lily would develop an attachment disorder. Lily was not like some children who could transition from one healthy attachment to another. Her posttraumatic stress symptoms indicated she would not be able to transition. For the department to argue otherwise borders on callousness.

The department further argues the attachment disorder would not happen under the transition plan because a change in the children's placement would occur only if the transition was successful. However, the department overlooks the evidence that both children, but particularly Lily, were already exhibiting symptoms just with visitation.

*Posttermination Order on Any Change of Placement*

The department also contends the juvenile court exceeded its authority after it terminated parental rights by requiring the department, if it subsequently wished to change the children's placement, to first explain why such a change would not be a gross violation of its discretion. The department relies on the language of section 366.26, subdivision (j) and interpretative case law for the proposition that once parental rights are terminated, it—not the court—has exclusive authority and discretion over adoptive placements. While we have no quarrel with either the statutory language or the decisions interpreting it, we nevertheless disagree the court exceeded its authority under the circumstances of this case.

California dependency law grants the juvenile court broad authority to make any and all reasonable orders for the care, custody and supervision of dependent children. (§ 362, subd. (a); *In re Robert A.* (1992) 4 Cal.App.4th 174, 188 [5 Cal.Rptr.2d 438].) The juvenile court can and regularly does delegate supervision of dependent children's custody to the department. In this way, the department is the court's arm. (*Ibid.*) However, in the normal course of dependency proceedings, when appropriate facts are brought to its attention the juvenile court may decide placement issues to the point of guiding and directing the department when it takes a contrary position. (*Ibid.*)

However, once parental rights are terminated in a given dependency, the department's role in a dependent child's custody and supervision changes. According to section 366.26, subdivision (j), "If the court, by order or

judgment declares the child free from the custody and control of both parents, or one parent if the other does not have custody and control, the court shall at the same time order the child referred to the State Department of Social Services or a licensed adoption agency for adoptive placement by the agency. However, no petition for adoption may be granted until the appellate rights of the natural parents have been exhausted. *The State Department of Social Services or licensed adoption agency shall be responsible for the custody and supervision of the child and shall be entitled to the exclusive care and control of the child at all times until a petition for adoption is granted.* With the consent of the agency, the court may appoint a guardian of the child, who shall serve until the child is adopted." (Italics added.)

 Courts interpreting the emphasized language of section 366.26, subdivision (j) have declared these words "clear." (*Department of Social Services v. Superior Court* (1997) 58 Cal.App.4th 721, 733 [68 Cal.Rptr.2d 239]; see also *Los Angeles Dept. of Children Etc. Services v. Superior Court* (1998) 62 Cal.App.4th 1, 10 [72 Cal.Rptr.2d 369].) The Legislature has granted to the appropriate department or agency the exclusive, meaning sole, custody, control and supervision of a child referred for adoptive placement. (*Department of Social Services v. Superior Court, supra,* 58 Cal.App.4th at p. 733; see also *Los Angeles Dept. of Children Etc. Services v. Superior Court, supra,* 62 Cal.App.4th at p. 9.)

 Notwithstanding section 366.26, subdivision (j), the department's discretion regarding adoptive and interim foster care placement is not unfettered. (*Department of Social Services v. Superior Court, supra,* 58 Cal.App.4th at p. 733; see also *Los Angeles Dept. of Children Etc. Services v. Superior Court, supra,* 62 Cal.App.4th at p. 9.) The juvenile court still retains jurisdiction over the child until, relevant to this case, the child is adopted to ensure the adoption is completed as expeditiously as possible and to determine the appropriateness of the placement. (§ 366.3, subds. (a), (d) & (e).)[9]

---

[9] Section 366.3, subdivisions (a), (d) and (e) provide as follows:

"(a) If a juvenile court orders a permanent plan of adoption or legal guardianship pursuant to Section 360 or 366.26, the court shall retain jurisdiction over the child until the child is adopted or the legal guardianship is established, except as provided for in Section 366.29. The status of the child shall be reviewed every six months to ensure that the adoption or legal guardianship is completed as expeditiously as possible. When the adoption of the child has been granted, the court shall terminate its jurisdiction over the child. . . . [¶] . . . [¶]

"(d) If the child is in a placement other than the home of a legal guardian and jurisdiction has not been dismissed, the status of the child shall be reviewed at least every six months. The review of the status of a child for whom the court has ordered parental rights terminated and who has been ordered placed for adoption shall be conducted by the court. . . . The court shall conduct the review under the following circumstances

"(1) Upon the request of the child's parents or legal guardians.
"(2) Upon the request of the child.
"(3) It has been 12 months since a hearing held pursuant to Section 366.26 . . . .

Thus, the Legislature has authorized the juvenile court to review the department's exercise of discretion regarding posttermination placement. (*Department of Social Services v. Superior Court, supra,* 58 Cal.App.4th at p. 733; see also *Los Angeles Dept. of Children Etc. Services v. Superior Court, supra,* 62 Cal.App.4th at pp. 9–10.) "In other words, the court must assess whether [the department] acted arbitrarily and capriciously, considering the minor's best interests." (*Department of Social Services v. Superior Court, supra,* 58 Cal.App.4th at p. 734.)

In this case, immediately prior to its termination order, the juvenile court decided there was good cause not to follow ICWA's placement preference and denied the department's request to change Rhiannon's and Lily's placement, a decision which we affirm. There is no question but that the court had the requisite authority and jurisdiction to make this ruling. In reaching its decision, the juvenile court essentially found it would be detrimental to the children's well-being to change their placement. This is not a case of the juvenile court improperly substituting its independent judgment for that of the department.

Following the termination order, while the department has the discretion to make a different placement, absent some change in the children's circumstances, the department's decision to change the children's placement in this case would necessarily be detrimental to the children. In other words, for the department to so exercise its discretion in light of the court's recent decision would be facially arbitrary and capricious.

In addition, the department essentially had put the court on notice that it would make its own placement decision once rights were terminated, regardless of the court's decision. Such an attitude strongly suggests that the department was more interested in standing up to the court in some show of authority rather than acting in the best interests of Rhiannon and Lily.

█ Furthermore, under section 366.3 (see fn. 9, *ante*), it remains the department's burden to establish the appropriateness of the placement of a child freed for adoption. Thus, we fail to see how the juvenile court improperly shifted an evidentiary burden by directing the department to explain how a change in the children's placement would not be an abuse of its discretion.

---

"(4) It has been 12 months since a review was conducted by the court.

"The court shall determine whether or not reasonable efforts to make and finalize a permanent placement for the child have been made.

"(e) . . . at the review held every six months pursuant to subdivision (d), the reviewing body shall inquire about the progress being made to provide a permanent home for the child, shall consider the safety of the child, and shall determine all of the following:

"(1) The continuing necessity for and appropriateness of the placement."

In conclusion and under the extraordinary circumstances of this case, the juvenile court neither exceeded its authority nor improperly invaded the department's by ordering the department to come to court before moving the children and explain why such a change would not be an abuse of its discretion.

## DISPOSITION

The petition for extraordinary writ relief is denied.

Harris, J., and Buckley, J., concurred.