[No. C056832. Third Dist. May 27, 2009.]

In re N.M., a Person Coming Under the Juvenile Court Law.
SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN
SERVICES, Plaintiff and Respondent, v.
R.M., Defendant and Appellant.

**COUNSEL**

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Robert A. Ryan, Jr., County Counsel, and Jason A. Manoogian, Deputy County Counsel, for Plaintiff and Respondent.

Nicole A. Williams, under appointment by the Court of Appeal, for Minor.

OPINION

RAYE, J.—R.M. (appellant), father of N.M. (minor), appeals from the orders and judgment of the juvenile court setting a permanent plan of legal guardianship and appointing Y.C., a nonrelative, as the minor's legal guardian instead of P.M., the minor's paternal grandmother. (Welf. & Inst. Code, §§ 366.26, 395.)[1] Appellant contends there was insufficient evidence of good cause to deviate from the preference of the Indian tribe, the expert on the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.), and the Sacramento County Department of Health and Human Services (Department) to place the minor with the paternal grandmother. (§ 366.26, subd. (c)(1)(B)(vi)(II).)[2] We disagree and will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 19, 2005, the Department filed a juvenile dependency petition alleging the minor, then four months old, came within section 300, subdivisions (b) and (j) because of continuing substance abuse by appellant and the minor's mother, their inability to provide adequate support and care for the minor, and the mother's inability to provide appropriate care and supervision of the minor's half sibling, J.S., Jr., and ensure his attendance at school.[3] The petition was later amended to include additional allegations regarding mother's substance abuse and failure to participate in court-ordered drug testing and treatment.

Appellant was incarcerated at the time the petition was filed and was not present at the detention hearing two days later. The minor's mother, who was present at the hearing, informed the court that she had no Native American ancestry. Based on that representation, the court found the ICWA did not apply and ordered the minor and J.S., Jr., detained. Both children were placed with Y.C., a nonrelative.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] In Statutes 2006, chapter 838, section 52 the Legislature amended section 366.26 and added a sixth exception to the termination of parental rights, which provides: "The child is an Indian child and there is a compelling reason for determining that termination of parental rights would not be in the best interest of the child, including, but not limited to: [¶] . . . [¶] (II) the child's tribe has identified guardianship, long-term foster care with a fit and willing relative, or another planned permanent living arrangement for the child." (§ 366.26, former subd. (c)(1)(F)(ii).) In 2007 the exception was renumbered and now appears in section 366.26, subdivision (c)(1)(B)(vi)(II). (Stats. 2007, ch. 565, § 4.) We shall refer to the current statute unless otherwise indicated.

[3] J.S., Jr., was seven years old when the petition was filed. The father of J.S., Jr., is J.S., Sr.

On May 13, 2005, appellant, no longer in custody, appeared at the jurisdictional hearing and informed the court he was an enrolled member of the Miwok of Round Valley Reservation Indian tribe. The court ordered the Department to send notice of the dependency proceedings to the tribe and continued the hearing. Based on information provided by appellant, the Department sent notices in accordance with the ICWA.

The Round Valley Indian Tribes (Tribe) responded on June 7, 2005, indicating the minor was eligible for enrollment. The Tribe subsequently requested a paternity test to confirm the minor's tribal eligibility.

The court ordered reunification services to appellant and the minor's mother on June 17, 2005.

According to the September 8, 2005, addendum report, neither parent was participating in reunification services as required. The ICWA expert concluded there was clear and convincing evidence that out-of-home placement was warranted. The expert noted the minor had been placed in a home that was neither Native American nor tribally approved, and recommended that the social worker continue efforts to locate a relative, extended family, or Native American home. The report also noted the minor's paternal grandmother was interested in placement of the minor.

Appellant was returned to custody on September 9, 2005, for violations of parole.

At the October 13, 2005, jurisdictional hearing, appellant and the minor's mother submitted to the allegations in the amended petition. The court sustained the allegations and declared the minor and his half sibling dependents of the court. Appellant and the minor's mother were denied reunification services, as was J.S., Sr., who was present through counsel at the hearing. The court found both children adoptable and ordered adoption as the permanent plan, directing the Department to continue its efforts to locate placement for the children with an Indian family.

The Department's February 9, 2006, selection and implementation report recommended termination of parental rights. A family in Arkansas that had previously provided foster care for J.S., Jr., was being considered for possible placement of both children. The paternal grandmother, P.M., was also being assessed for possible placement. P.M. expressed an interest in adopting the minor but did not want to adopt J.S., Jr., because she felt he was "very aggressive" and "always hitting" the minor. The report noted that P.M. "is of Native Indian heritage, which allows the Department under the [ICWA] to consider [her] as a placement for [the minor] . . . ." The Department concluded it would be in the best interests of the children to place them in the Arkansas home together.

According to the May 18, 2006, addendum report, the Tribe had yet to express its opinion regarding placement of the minor. P.M. was assessed for placement and initially approved; however, a request for exemption with respect to her husband's criminal history was denied by the review board, causing the Department to conclude placement with P.M. was not appropriate.

ICWA expert Geni Cowan, Ph.D., reported that while a non-Indian placement was not preferable, it might be in the best interest of the minor. Cowan, along with the Tribe's representative and the social worker, agreed the sibling relationship between the minor and J.S., Jr., should be maintained. Cowan reported the Tribe "would not intervene in this case, and would not object to the adoption of the [minor] out-of-state, given the circumstances," and expressed her qualified support of a permanency plan of adoption.

As of July 2006 the minor had yet to be enrolled in the Tribe.

On September 14, 2006, P.M. informed the court she had purchased a home and divorced her husband, and wanted both children placed with her. The court ordered the Department to reassess her for placement.

On October 19, 2006, the court terminated parental rights and identified adoption as the permanent plan.

On October 26, 2006, appellant filed a notice of appeal of the termination of his parental rights.[4]

On November 6, 2006, the minor's counsel filed a motion for reconsideration of the permanent plan based on the court's order granting a section 388 petition filed by J.S., Sr., requesting that J.S., Jr., be returned to his care and custody. The minor's counsel argued legal guardianship was the appropriate plan in order to preserve the sibling bond, suggesting placement with J.S., Sr., in order to maintain that bond. Appellant, in a subsequent motion for reconsideration, agreed.

The motions were heard on November 30, 2006, at which time the court requested an updated report from both the ICWA expert and the Department addressing "[a]ppropriate permanency options for the [minor]," "the nature of the relationship [between] the sibling[s]," and "[a]ssessment of relatives for appropriate placement of the [minor]" in light of the fact that J.S., Jr., had been returned to the care and custody of J.S., Sr. The Department reported that although "it is crucial for [the minor] and his brother . . . to maintain

---

[4] This court granted the Department's request to dismiss that appeal on March 20, 2007. (*In re N.M.* (Mar. 20, 2007, C054045) [app. dism. by order].)

their sibling relationship, [the minor] does not appear to be suffering any detriment due to his separation from his brother." The Department concluded termination of parental rights was appropriate in order to free the minor for adoption and recommended placement with P.M., not only to give the minor "the most permanency" but also to "provide the enriched Indian culture that he would not experience in [J.S., Sr.'s] home."

The court granted the motion for reconsideration on January 11, 2007, and reinstated parental rights.

The Department filed an addendum report on February 21, 2007, addressing the possibility of placement of the minor with J.S., Sr., and an update on the progress of the Interstate Compact on the Placement of Children (ICPC; Fam. Code, § 7900 et seq.) regarding potential placement with P.M. in Oregon. Due to financial constraints and other circumstances, placement of the minor with J.S., Sr., was no longer a possibility. Although the evaluation of P.M. was not yet complete, the Department reported that a supervised visit between P.M. and the minor "went well," and another visit would be scheduled the next time P.M. was in Sacramento. P.M. acknowledged the importance of the relationship between the two siblings and remained open to maintaining regular contact between them, noting she made regular trips from Oregon to visit the family in Sacramento. The Department recommended termination of parental rights and placement of the minor with P.M. Adoption by Y.C. was recommended only if P.M.'s ICPC failed.

At the March 19, 2007, hearing, the Department informed the court that Oregon had approved the ICPC for P.M. According to the Department, it was in the minor's best interest to move him from his current placement with Y.C. to his paternal relative in Oregon given that the siblings could no longer be placed together.

The fifth addendum report contained a copy of the completed ICPC regarding P.M. Relying on federal ICWA statutes (25 U.S.C. § 1915(a)), the Department noted that in placing an Indian child for adoption, preference must be given in the following order: "(A) to a member of the Indian child's extended family; [¶] (B) to other members of the Indian child's tribe; [¶] (C) to other Indian families." Because P.M. was a member of the minor's extended family and was assessed and approved through ICPC in Oregon, the Department found her to be a viable candidate for placement. P.M. assured the Department she would visit Sacramento regularly and schedule visits between the minor and his half sibling, and that she would be willing to move to Sacramento if necessary. Based on those representations, the Department concluded placement with P.M. outweighed any benefit of placement with a non-Indian family living close to J.S., Jr.

According to the sixth addendum report filed on April 30, 2007, the ICWA expert and the Tribe agreed the minor should be placed with P.M. under a plan of legal guardianship.

The eighth addendum report, filed July 26, 2007, noted Y.C. had withdrawn her application for adoption because of an incident involving her biological son, D.C.,[5] who had sexually abused a child in daycare in Y.C.'s home and been taken into custody. The Department subsequently assessed the minor and determined it was safe for him to remain in Y.C.'s home for the time being. However, the Department assumed Y.C. would lose her daycare license and would no longer be a viable candidate for permanency for the minor, and therefore reiterated its recommendation that the minor be placed with P.M.

The permanency plan hearing commenced on August 16, 2007. All parties agreed on guardianship as the permanent plan. Appellant, the Tribe, and the Department urged the appointment of P.M. as the guardian. The minor's counsel favored Y.C. The court heard testimony from various witnesses, including P.M., Y.C., and Cowan. The court concluded both the Indian child exception and the sibling exception applied, finding a permanent plan of guardianship with Y.C. was appropriate. In doing so, the court specifically found there was good cause to deviate from the placement preference of the Tribe, the ICWA expert, and the Department.

Appellant filed a timely notice of appeal.

## DISCUSSION

Appellant contends the juvenile court's finding of good cause to deviate from the preference of the Tribe, the ICWA expert, and the Department and place the minor with Y.C. is not supported by substantial evidence. We disagree.

■ Where the ICWA applies, the juvenile court must adhere to the placement preferences set forth in the act absent good cause to the contrary. (25 U.S.C. § 1915; Cal. Rules of Court, former rule 5.664(k).)[6] "[A]ny party claiming a good cause exception to the placement preference bears the burden of proof . . . ." (*Fresno County Dept. of Children & Family Services v. Superior Court* (2004) 122 Cal.App.4th 626, 632 [19 Cal.Rptr.3d 155] (*Fresno County DCFS*).)

---

[5] D.C. was 15 years old at the time of the incident.

[6] While section 1915(a) of title 25 of the United States Code refers to an "adoptive placement," it is reasonably clear, and we assume for purposes of our analysis, that the statute or the nearly identical language in section 1915(b) (relating to "foster care or preadoptive placement") applies to guardianships.

Our review of a juvenile court's finding of good cause to modify the placement preference order is subject to the substantial evidence test. We review the entire record to determine whether there is any substantial evidence, "whether or not contradicted, which will support the conclusion of the trier of fact. [Citation.] All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the decision, if possible. We may not reweigh or express an independent judgment on the evidence." (*Fresno County DCFS, supra,* 122 Cal.App.4th at p. 646.)

Here, minor's counsel bore the burden of establishing good cause. To that end, Y.C. testified regarding her relationship with both the minor and his half sibling, J.S., Jr. The minor was initially placed with Y.C. in her home in California, and for the next two years, Y.C. provided him constant care. She cared for J.S., Jr., for nearly two years as well, until he was placed with his father, J.S., Sr. Y.C. observed a close relationship between the two siblings, with J.S., Jr., often acting as the minor's "mini dad." She never observed any violent or aggressive behavior by J.S., Jr., toward the minor, and after J.S., Jr., was returned to his father's care, Y.C. worked with J.S., Sr., to facilitate visitation between the two siblings approximately three times each month. While the Department had yet to provide her with any contact resources to get the minor involved with the Tribe, she expressed her willingness to facilitate contact between the minor and the Tribe, as well as his biological family members. In the meantime, the minor became "part of [Y.C.'s] family," doing everything with Y.C., including reading books, going to the park, going to the zoo, eating, and watching movies. As soon as Y.C. learned that adoption of the minor was an option, she immediately took steps to begin the adoption process.

Regarding the incident involving her son, D.C., Y.C. explained that it could only have occurred during a period not longer than 15 minutes when she was in the backyard and the children were inside sleeping, unsupervised. She further explained how and when the incident was brought to her attention and what she did to protect the minor and the other children in the wake of that knowledge. She testified that in order to keep the minor and her other biological son safe, she would not allow D.C. back into her home following his release from juvenile hall and would instead send him to live with relatives in Atlanta or with his stepfather in Long Beach.

On the other hand, as the juvenile court remarked, the record contains very little information regarding P.M. as an appropriate placement other than "a one page check-the-box form," and provides "no specific information regarding the grandmother's home or appropriate assessment of the grandmother." The testimony of Dr. Cowan; social workers Mary Hamilton, Bonnie Early, and Pascale Buzbee; and the paternal grandmother, P.M., did little to rectify

that problem. Cowan attested to the sibling tie between the minor and J.S., Jr. However, she admitted she did not review any information regarding Y.C. and based many of her opinions on information provided by P.M. Ultimately, Cowan gave very few specific details regarding P.M. and concluded the minor should be placed with her based primarily on the fact that P.M. is a member of the Tribe.

Hamilton, on the other hand, stated the siblings were bonded and concluded the minor was safe in the care of Y.C. so long as D.C. did not return to the home after being released from juvenile hall. Hamilton characterized the relationship between Y.C. and the minor like that of "mother and son," noting P.M. never called to inquire about the minor and visited him only two times.

Buzbee and Early both testified P.M. visited the minor six to seven times. Buzbee recommended placement with P.M. based on the ICWA preference for placement with an Indian parent or relative, but provided no specific information regarding P.M. other than to describe her history of visitation with the minor. Similarly, Early provided little, if any, information regarding P.M. other than to note that P.M.'s first contact with the foster care agency to request visitation with the minor was not until April or May of 2007, two years after the minor was first assigned to the agency. Early observed a bond between the minor and his half sibling, and noted that Y.C. continued to facilitate visits between the two children even after J.S., Jr., was placed with his father. According to Early, P.M. never inquired about the minor's feeding and sleeping schedule, and never called to inquire about the minor's welfare, only calling to set up visitation.

P.M.'s testimony was conflicting at best. She testified she visited the minor regularly after he was placed in foster care but admitted that except for one or two visits, she generally came down from Oregon to visit only when there was a court hearing. When pressed for specifics, P.M. testified she visited the minor in the hospital when he was born and may have visited him at his parents' house one or two times, but admitted she did not visit him during the period after he was taken into protective custody and before she moved to Oregon. When asked what efforts she would undertake to maintain the bond between the minor and his sibling, P.M. said she would "get [J.S., Sr.'s] number again and talk to him, make arrangements and see what would be appropriate, what day would be good." However, she admitted she did not really know J.S., Sr., that well. When asked what efforts she had made to get to know J.S., Sr., to facilitate the sibling bond, P.M. stated she approached him one day after court and asked for his telephone number so that they could talk. Although P.M. said she kept in regular contact with Buzbee to discuss the minor's status, she called Y.C. just three times (once when Y.C.

was not at home) to ask how the minor was doing, and never sent him presents or asked for pictures of him because she had pictures of her own. More importantly, despite her prior representations to the court that she was divorced from her husband, she testified they were separated but still "[t]echnically" married, and acknowledged that she was "[n]ot yet" in the process of obtaining a divorce, though that was her goal.[7]

As the juvenile court pointed out, at one time the preference of all involved was to place the minor together with his half sibling in an adoptive home in Arkansas. Once J.S., Jr., was placed with his father, visitation continued between the two children on an ongoing basis. P.M.'s promise to maintain the sibling relationship is belied by the fact that she herself made only a handful of visits from Oregon to California to visit the minor, and the fact that she had done little to build a working relationship with J.S., Sr., to facilitate regular visits between the siblings. Moreover, it appears that P.M. misled the juvenile court in September 2006 regarding the status of her marriage and had yet to obtain a legal divorce as of the final hearing, calling into question, among other things, the credibility of any exemption regarding her husband's criminal history.

While appellant finds Y.C. to be "highly questionable" as a placement for the minor, the juvenile court found her to be credible. We do not revisit such findings on appeal. (*Fresno County DCFS, supra*, 122 Cal.App.4th at p. 646 ["[I]ssues of fact and credibility are matters for the trial court alone."].) In any event, Y.C.'s testimony, particularly that regarding her son's molestation case and the measures she took to protect the minor and continue his care without interruption, was supported by the evidence.

In a novel argument raised for the first time in his reply brief, appellant argues the "good cause" requirement has been changed, by virtue of language in section 366.26, subdivision (c)(1)(B)(vi) (formerly § 366.26, subd. (c)(1)(F), renumbered effective Jan. 1, 2008), such that if a tribe identifies as the preferred permanent plan guardianship "with a 'fit and willing relative,' " the court must determine "whether that relative is, in fact, 'fit and willing.' " (Quoting § 366.26, subd. (c)(1)(B)(vi)(II).) The focus here, appellant argues, is therefore not on a comparison between P.M. and Y.C., but rather on whether P.M. is fit and willing. Appellant is wrong.

First, as set forth above, the statutory scheme is construed to conclude that if the tribe recommends guardianship as the *preferred permanent plan*, the court is bound by that decision. On the other hand, if the tribe identifies *a placement*, the court must show good cause to deviate from that preference.

---

[7] P.M. stated she had not obtained a divorce because she did not want to pay for it.

Even were we to follow appellant's construction of "fit and willing," his claim would fail because the court indeed selected guardianship, not adoption, as the permanent plan. In any event, we do not agree with appellant's construction because, under the clear language of section 366.26, subdivision (c)(1)(B)(vi)(II), the phrase "fit and willing" modifies long-term foster care, not guardianship.

 The juvenile court found there was good cause to deviate from the preference of the Tribe, the ICWA expert and the Department and place the minor with Y.C. Substantial evidence supports that determination.

## DISPOSITION

The order of the juvenile court is affirmed.

Scotland, P. J., and Cantil-Sakauye, J., concurred.