Filed 6/14/13  C.T. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| C.T., and M.W.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>        Respondent;<br><br>SAN MATEO COUNTY HUMAN SERVICES AGENCY, E.W.,<br><br>        Real Parties in Interest. | A138123<br><br>(San Mateo County<br>Super. Ct. No. 81955) |

        C.T. and M.W., the parents of baby E., petition under rule 8.452 of the California Rules of Court to vacate an order setting a selection and implementation hearing pursuant to Welfare and Institutions Code section 366.26.**1**  Mother contends she should have been offered additional reunification services after the 12-month review hearing, that there was insufficient evidence that E. would be at substantial risk if returned to Mother's care, and that she was not offered adequate reunification services.  She also contends the court erred when it found the child welfare agency made active efforts to reunify the family as required by the Indian Child Welfare Act (25 U.S.C. § 1912 et seq. (ICWA, or the Act)) and complied with the ICWA's preferences for placement with an Indian family.  Father,

---

        **1** Unless otherwise noted, all further statutory references are to the Welfare and Institutions Code.  References to rules are to the California Rules of Court.

1

like Mother, alleges inadequate reunification services under the ICWA and violation of the ICWA's placement preferences without good cause.

The order setting the section 366.26 hearing is supported by substantial evidence and complies with the ICWA, so we deny both petitions on their merits.

## BACKGROUND

### Detention, Jurisdiction and Disposition

E. was born prematurely at Lucille Packard Children's Hospital on December 3, 2011. The same day he was admitted to the neonatal intensive care unit and referred to the San Mateo County Children and Family Services Agency (the Agency). The referral to the Agency reported that Mother is developmentally delayed and has a history of drug and alcohol abuse. Her multiple diagnoses include personality disorder with volatile explosive behavior pattern, "major depressive disorder vs. mood disorder not otherwise specified," impulsive control disorder, borderline personality, and mild mental retardation. She also suffers from diabetes. Mother is a client of the Golden Gate Regional Center (Regional Center), which provides her with housing and 24-hour in-home supported living care through Hope Supported Living.

On November 30, 2011, Mother was hospitalized for diabetes and out-of-control behavior. On December 2, the day before E. was born, the staff at Mother's supported living apartment expressed reservations about her ability to safely care for a newborn baby. Their concerns focused on her impulsivity and rage, as well as her refusal to manage her diabetes care despite the in-home assistance she received. Mother's medical social worker reported that Father is alcoholic and lives with his family in San Francisco. Mother and Father have a history of domestic violence. Mother frequently fought with her supported living staff and sometimes left for extended periods to look for Father in San Francisco without notifying her caregivers.

On December 12, an Agency case worker attended a meeting with Mother's case manager, Olen Simon, and her other service providers. Simon reported that the Regional Center had been providing services to Mother for six years and over the most recent four years she had been in and out of psychiatric hospitals, including a locked facility. Mother

2

had lived in the supported living apartment for two years and had been evicted from two apartments for loud and volatile behavior. According to the detention report, "Mr. Simon stated, '[Mother] is narcissistic and self absorbed. I am concerned about the child's health and well being under [her] care.' Mr. Simon stated that the mother is 'mentally challenged.' He stated, 'There are all kinds of red flags. The worst case is grabbing or throwing the baby. Today she was grabbing the keys to the van. What if the baby was at home?' Mr. Simon stated that the mother cannot control herself." Simon also said Mother refused to see a psychiatrist or take psychotropic medication. He felt that she " 'does not have the skills to be a parent. She lacks emotional skills. I do not know if she will be able to recognize if the baby is ill or if the baby is not feeding properly. She will fight with the staff all the time. She will never change.' "

Registered nurse Doreen Canton, another of Mother's service providers, had "grave concerns" that a crying infant would set mother off and she might shake the baby. Further, Mother was "in denial with her diabetes." Hope Supported Living administrator Oscar Omoragbon said Father drank heavily and that police had responded to fights between Mother and Father at Mother's apartment. Omoragbon feared for the baby because Mother was impulsive and prone to rages. Omoragbon and Canton had concerns about placing E. with Mother even with the services she received and 24 hour-supervision through her supported living program.

Father is of Navajo descent through his mother and E. is eligible for enrollment in the Navajo tribe. He told E.'s case worker that he lives with and helps care for his mother (Grandmother) in San Francisco. She is diabetic and has knee problems. Father is also the primary caretaker for his brother, who has serious health problems. Father said that his own medical problems and caretaking responsibilities for Grandmother kept him in San Francisco three to four days a week and that he could not be with Mother every day. On December 15, 2011, Father reported that Grandmother was willing to care for E. and he wanted the Department to explore her as a possible placement.

On December 16, 2011, the Agency filed a dependency petition alleging both parents' failure to protect E. from harm. (§ 300, subd. (b).) The petition alleged that

3

Mother's mental, emotional and medical instability placed E. at a substantial risk of harm and that she refused to participate in multiple services offered to address her own needs and help her adequately care for her baby. In addition, Mother "regularly exhibits oppositional and explosive conduct toward the staff at the supported living facility where she resides, and engages in altercations with the alleged father . . . when he comes to visit her there."

The petition alleged that Father has "a criminal background that includes drug and alcohol-related convictions, engages in altercations with the mother. . . in her home, and has been arrested twice within the last four months for public intoxication while visiting here there. Furthermore, the father suffers from multiple medical conditions, and significant caregiving responsibilities for his own mother and brother." The Agency's petition concluded that Father's "physical incapacity, ongoing alcohol abuse problem, and his lack of consistent availability to care for the child places the child at substantial risk of harm."

On December 19, 2011, the juvenile court ordered E. detained, ordered that Mother undergo a medical evaluation, and set a jurisdictional hearing for January 25, 2012. The Agency recommended that E. be declared a dependent child of the juvenile court in out-of-home placement and that both parents receive reunification services. E. was discharged from the hospital on January 7 and placed in a foster home for medically fragile infants.

On May 29, 2012, the Agency filed an amended petition alleging concerns remained about Mother's ability to adequately care for E. despite the services being provided to her. Mother was not properly treating her diabetes, which put her own health and life at risk, and required direction on safely holding and caring for the baby during visits.

A contested jurisdiction/disposition hearing was held over three days between May 24 and June 15, 2012. At the conclusion of the hearing the court sustained the petition, declared E. a dependent child, and found by clear and convincing evidence that placing him with his parents would be contrary to his welfare. The court further found by

4

clear and convincing evidence that E. was or might be an Indian child, that continued physical custody with his parents was likely to cause serious emotional or physical damage, and that active efforts were made to provide services to prevent the breakup of an Indian family. No Indian foster homes had been located in San Mateo County, so the court found good cause to place E. in a non-Indian foster home.

The court ordered Father to refrain from using drugs or alcohol and to participate in a mental health evaluation, ordered supervised visitation with both parents, encouraged increased visitation, and approved the Agency's case plan. Mother's case plan included anger management and domestic violence services, visitation, parenting education, psychiatric therapy and other recommended mental health treatment including a psychotropic medical evaluation and attending all medical appointments and following the doctors' recommendations. Father's case plan included domestic violence and substance abuse services (including drug testing, assessment and treatment), counseling, parenting education, and maintaining sobriety. He was ordered to provide the names of Indian relatives for potential placement.

Both parents appealed the jurisdictional order. Their appeals are before this court in case No. A135812. We take judicial notice of the records and briefs in that appeal.[2]

### The 12-Month Review Reports

Because these writs are taken from orders made at the joint six and 12-month review hearing, we will primarily restrict our discussion to the evidence considered in that hearing. On November 30, 2012, the Agency filed its report for the review hearing set for December 12, 2012. Mother was attending parenting classes, individual therapy, and supervised visitation. Father spent most Tuesdays and Thursdays visiting with E. at Mother's assisted living home and was attending parenting and anger management classes. Dyad therapist Betty Loyola reported that Mother was becoming more conscious of handling E. gently and learning to be aware of his cues. She had attended seven therapeutic parenting classes with E., including two observational/assessment sessions,

___

[2] We also grant Mother's application to augment the record to include Mother's hearing exhibits A through D.

5

three collateral sessions and two dyadic/assessment sessions with Loyola. Mother sometimes handled the baby roughly, but she was making some minor positive changes and seemed receptive and highly motivated. Mother had also attended 21 individual therapy sessions and was making some progress on reducing impulsive behaviors and regulating her emotions. She also attended a weekly life skills group and a "Living Experience" class. Although she was taking her medications in front of supported living staff, her diabetes was not under control.

E.'s foster mother reported on November 28, 2012, that Mother was sometimes argumentative with the supported living staff and asked for visits to start later because she likes to sleep in. She also noticed that Mother did not consistently make E.'s medical appointments, and that the baby did not smile when Mother greeted him.

In January 2012, a social worker asked Grandmother about her interest in having contact with E., and gave her contact information for E.'s case worker. Some eleven months later, on November 27, 2012, Mother told the Agency she would provide a letter from Grandmother stating that Grandmother would like to care for E..

Mr. Simon, Mother's Regional Center case manager, reported incidents of Mother and Father screaming at each other, but he concluded that "everything seemed to be going fairly well." Father was attending Alcoholics Anonymous (AA) meetings, parent education and anger management classes, but had cancelled two appointments for a psychological evaluation.

The Agency's report observed that reunification services were "slow to begin" during the five months that preceded the jurisdiction and disposition hearing. Mother's health had been an ongoing concern, and she had only started to consistently manage her diabetes medication within the past two months. Father had also been slow to access services and only recently began to attend anger management classes.

Lynette Mose, an ICWA social worker with Navajo Children and Family Services, said there were no Navajo homes available for placement in the Bay Area. Mose agreed with the reporting social worker that E. should be placed in a local, non-Indian foster home so that his parents could continue to visit him. Because there was no guarantee that

6

a Navajo or other Native American adoptive home could be found if reunification failed, and in order to minimize future placement changes, Mose felt that a local fost/adopt placement would be preferable to a regular foster placement.

In a December 5, 2012, addendum report, the Agency recommended that family reunification services be terminated. Although both parents had accessed services and worked to ameliorate the reasons for E.'s removal, the Agency believed he could not safely be returned to their care within the 12 months specified under section 361.5 for children under the age of three.

On December 12, the date set for the combined six and 12-month review hearing, the court authorized overnight visits with Mother and continued the contested hearing to January 25, 2013. On January 23, 2013, the agency filed a second addendum report with an attached letter from Polly Gloudemans, Mother's public health nurse. Gloudemans reported that Mother was very loving and affectionate towards E., but refused to meet with her or take her diabetes medications. Mother's physician reported that her ability to take care of her health was "limited at best" and lab tests showed a significant worsening of her diabetes control. Because of the severe consequences of diabetes, including diabetic coma, kidney failure, blindness and limb amputation, Gloudemans warned that Mother's failure to manage her disease presented a risk to E.'s safety.

Therapist Dr. Stephanie Coates reported that Mother had made progress in using positive self-talk to manage her impulses and emotions around E., and in her level of insight. Dr. Coates was Mother's individual therapist, so she had not observed Mother interact with E..

The January 23 addendum included Mr. Omoragbon's report on the first two nights in his young life, December 21 and 24, E. visited overnight with Mother. On the first visit Mother became upset when Father had to leave, so she asked that E. be taken back to his foster home. However, she settled down afterward and the visit "went fine." The second visit did not go as well. Mother had difficulty with E.'s crying and responded by telling him to " 'shut up' " and " 'shut the fuck up.' " She again asked to end the visit early so she could go look for Father. Also attached to Omoragbon's report were

7

visitation observation records prepared by Mother's parenting coach, Anabel Zepeda, and therapist Loyola, both of whom testified at the review hearing as discussed below.

The Agency continued to recommend termination of services. The addendum report explained: "The mother has made progress, most notably in her ability to not react when she gets angry. However, she continues to interpret parenting advice as criticism, becoming defensive and unable to put into acting what she is hearing. In addition, as Ms. Zepeda stated the mother is not engaged with E. during visits, choosing to put him to sleep or strap him into a car seat so that he is quiet and she can relax. Further, there have been at least two incidents where the mother told E. to 'shut up' when he was crying, unable to recognize his cues and respond to his needs. As Ms. Loyola stated, 'this therapist is highly concerned of the child's emotional well-being as evidence of his recent change of behavior when in the care of the mom,' especially her unwillingness to respond to E.'s cues. To the mother's credit she has set limits with the father and has not allowed him into the home when he is drinking. However, she continues to want to look for him to put E. second to her need to locate the father. As there have been a number of incidents where the mother has failed to respond to E.'s cues appropriately, thus putting him at risk, continuing reunification services would be detrimental to his well-being." Father had visited E. consistently and attended eight anger management sessions, but had not completed court-ordered services, continued to drink, and refused to attend substance abuse programs or undergo a psychological evaluation.

Loyola testified at the January 25 hearing that she had been Mother's child-parent therapist since October 2012 and also facilitated Mother's hands-on parenting group. Mother was occasionally inappropriate in the parenting group, engaging with other parents but not attending to E.. She had made little progress toward responding appropriately to E.'s needs and recognizing when his behavior "triggered" her. E.'s affect had become flatter and he was fussier around Mother since visitation increased and overnight visits began in December. After the first overnight visit, Mother asked Loyola "if it was okay to ask the social worker if she cannot have [E.] for New Year's Eve because she didn't want to be home with the fucking crying baby." Despite her earlier

progress, Mother recently seemed overwhelmed and on one occasion slapped E.'s hand when he threw his bottle.

Loyola was initially optimistic about the possibility that Mother could reunify with E., but by the January 25 hearing she no longer thought Mother would be capable of gaining custody within six months. Mother was motivated, but lacked the requisite awareness to meet E.'s needs, be emotionally available to him, and make him feel safe and secure. Although Loyola cared very much about Mother, she recommended termination of overnight and unsupervised visits and that E. be placed in a fost-adopt home as soon as possible.

Apple Family Works (Apple) contracts with the Regional Center to assist its clients with their parenting skills. Apple Works health educator Anabel Zepeda supervised visitation and helped Mother with her parenting skills for a little over a year. Zepeda testified that Mother had shown some improvement and that she took care of E., sometimes with prompting and sometimes on her own. For example, sometimes Mother recognized when E. was not feeding properly and sometimes she did not seem to know there was a problem. At times she could comfort him, but sometimes Zepeda needed to prompt her to do so. Mother picks E. up appropriately "for the most part," but at other times she needed instruction to handle him safely. She had improved her ability to maintain a safe environment for E., but here, too, she sometimes required prompting. Mother's volatility and ability to control her emotions had improved "a lot."

However, Zepeda had not seen as much progress over the previous three or four weeks as in the past. Like Loyola, she said E.'s mood and energy level had dropped since Christmas. The change coincided with E.'s overnight visits with Mother, but also with his being sick and changes in his diet. Asked whether Mother would be able to successfully provide for E.'s safety if given six more months of services, Zepeda responded: "I definitely think mom will continue to make improvement because she has shown for this year that she can improve. [¶] I cannot say that she will be where she needs to be in six months. Because that will be being unrealistic. I cannot answer that

9

question. But I know that she can continue improving in six months." Zepeda testified that Mother's interest in being a parent "fluctuates."

Mr. Simon testified that Mother receives housing and 24-hour in-home care supervision and daily living assistance from the Regional Center and parenting assistance from Apple. Mother was no longer assaulting the supportive living staff or Father and she had stopped leaving the apartment to go look for Father in San Francisco without telling staff. She was better at being patient, holding E. safely, and diapering, but she needed to improve in caring for the baby on her own and understanding his coming milestones. Simon felt that, with the Regional Center services already in place and a slight increase in parenting services from Apple, Mother would eventually be ready to care for E. However, he could not say that it would happen within six months. Simon testified that Father has good parenting skills, is affectionate, and meets E.'s emotional needs.

The Agency filed a third addendum report on January 30, 2013. Five pages entitled "Description of Episode or Behavior," dated from mid-October to mid-December, 2012, and 84 pages of "Daily Progress Notes" were appended and discussed in the report. The addendum's author noted that "when the visit is considered unsupervised, and with only Hope Supported Living staff present, the mother uses profanity and excessive force directed at the child," and numerous such episodes were said to be described in the attached records. Also discussed were a distressing number of instances of Mother ignoring and neglecting E. while he cried. On several occasions Father was in the home and intoxicated. There were several reported episodes of domestic violence that included Mother throwing objects and Father leaving the home with a bruised face.

One of the more egregious episodes occurred on January 21, when Mother became frustrated with E.'s crying and threw a toy, which hit him in the face. On January 8th, staff asked Mother to pick the baby up after he had been crying for five minutes. Mother complied, but when E. rejected the water and juice she offered she put him back down "forcefully" and shook him "very hard." Staff tried to stop her, but she told them to shut

10

up and told the baby to "shut the funk [sic] up." On December 31, 2012, E. started crying when the foster parent left after dropping him off at Mother's home. Mother "plop[ped] him down [and] told him to 'shut his fucken ass up.' " Later during the same visit she told the crying baby, "if you don't shut the fuck up I'll [throw] your ass in the creek.' " On other occasions Mother expressed dismay at having to take care of the baby or asked that he be picked up before the end of a visit. Sometimes she neglected him, ignored his needs, or was inappropriately rough with him.

The hearing resumed again on February 1, 2013. Simon clarified his January 25th testimony by explaining that Mother would not be able to reunify with E. in six months if services were to end then, but that she could do so if the services continued after E. was placed with her. Simon had only observed Mother and E. together three or four times in the preceding six months, but he communicated frequently with Zepeda, Loyola and other service providers. It was his opinion that the recent addendum report overstated the severity of the incidents it described. He thought Mother should receive another six months of services based on the possibility that her behavior would improve, although he had not seen improvement over the prior six months except for her reduced volatility and could not say that her behavior would change if given another six months.

At the conclusion of the February 1 hearing, the court granted a request by E.'s attorney to terminate overnight and unsupervised visits. E. was placed in a fost-adopt home on February 5, 2013.

On February 25 the Agency filed its final addendum report. Supervised visits were going well and had been stable since the February 1 hearing. Sometimes Mother needed a lot of prompting in regards to E.'s care and safety, and on other visits needed little or none. She sometimes accepted Zepeda's prompting but sometimes was more resistant to it. Zepeda reported that Mother was not confrontational with her, but that the supported living staff told her Mother's demeanor changed when Zepeda left. Mother and Father sometimes argued in front of E.

Father visited E. regularly and was supportive of Mother, but he was not assertive and often took a " 'back seat' " to her. He was attending AA meetings and anger

11

management classes but had not completed the court-ordered psychological evaluation and was still drinking.

The final sessions of the review hearing were held on February 27 and March 1, 2013. Larry Bogatz, Mother's case worker for the previous seven months, testified that there was no substantial probability of her reunification with E. within six months. Dr. Coates, Mother's individual therapist, had been helping Mother chart and manage her medication, develop a plan to help her manage her impulses and defiant behavior, and develop social skills and interact with others. Dr. Coates also referred Mother to other mental health services. Mother was better at managing her impulses and behavior, but made minimal improvement in managing her medications and developing social skills. She was keeping a medication chart and taking some of her medicine but refused to take one prescription medication. She attended individual and dyad therapy and had attended 12 parenting classes. She infrequently attended E.'s medical appointments, but his occupational therapy was done at her house and she attended those appointments. There had been reports of domestic violence within the previous six months.

Bogatz was asked about the Agency's consideration of Grandmother as a possible caretaker. He said that although Grandmother inquired at one point, she was ruled out because of her limited ability to care for herself in light of her age and health problems. Moreover, Father lived with Grandmother and continued to drink to the point of intoxication, "[s]o it wasn't a consideration we were willing to under[take]." Father also provided care for Grandmother, her elderly sister, and his ill brother, who also lived with Grandmother "[s]o we have four people in the home that are really unable to care for a toddler. So based on that assessment, we didn't really go any further."

In November 2012 Grandmother wrote to the Agency and said she would be willing to care for E.[3] The Agency did not pursue this as a possibility because it already knew about her health problems. Mother told the Agency that she did not want E. placed with Grandmother.

---

[3] Her letter is not in the record.

12

Bogatz did not believe Mother could reunify with E. within six months. He explained: "Mother has no–there's not an attachment, there's no bond with the child. And [Mother] is still – let me say that she loves E., but it's not an unconditional love. She puts her own needs, which are not mental health [sic] necessarily, ahead of the child's." Mother had complied with her reunification plan to the best of her ability, but had not improved sufficiently to safely care for E. For that to happen, she would have to be able to put his needs ahead of her own and Father's, be able to nurture and interact with him, and no longer seek to terminate their visits early.

Bogatz observed eight or nine of Father's visits with E.. When Father was available he was nurturing and positive, but he would defer to Mother and did not interact with E. actively when Bogatz was there. On two or three visits he brought alcohol or was intoxicated, and in January staff arrived at Mother's home to find Father drunk and the apartment smelling of marijuana.

Father had been attending AA meetings since October 29, 2012, and he participated in the dyad therapy with Ms. Loyola. But he had not complied with either the alcohol and drug assessment or substance testing requirements of his plan, and he was still drinking to intoxication.

The Agency planned to work with the Navajo tribal representative to find a suitable placement for E. His fost/adopt home was not an Indian home and his foster parent knew he might be moved for that reason.

Mother also testified. She denied that she threw a toy at E. or said she did not want to be home with him on New Year's Eve. There was only one occasion when she asked the social worker to pick E. up early from a visit, and that was because she was overwhelmed by "court stuff" and did not want him to see her upset. She once "tapped" on his hand when he threw his bottle at her ankle, but she never slapped him. She also denied that she put E. in a car seat or walker to keep him from moving around, and she did not believe she handled him roughly. She also never left for San Francisco to look for Father without notifying her supportive living staff.

13

Asked about her relationship with Polly Gloudemans, the public health nurse, Mother said Gloudemans lied about her not taking her medications and that "I wasn't really getting the help that I really was supposed to be getting from her." She asked for a different public health nurse but was told no others were available. Mother told Mr. Bogatz that she did not want E. placed with Grandmother because she wanted him to live with her. But if E. could not live with Mother, she had no objection to his placement with Grandmother. But fost/adopt social worker Lee Baker testified that on February 6, 2013, Mother said she did not feel E. should be placed with Grandmother "because she was in her 70's, and she had knee problems and because she couldn't keep up with life."

Father testified that he had a little arthritis but no medical condition that would prevent him from caring for E. He only drinks socially, "once in a great while." Bogatz gave him a referral for a psychological evaluation, but the person he met with gave him some forms that he did not understand, so he refused to sign them. He never made a new appointment for an evaluation "because I really didn't know what the point was to that anyway."

Father attended an anger management class because Mother's cousin lied and said he was hitting Mother so the police put him in jail. Father denied that he initially told the social worker he did not want custody or that Grandmother was not capable of caring for E..

Robin Palmer, a graduate student intern, had been assigned to E.'s case for two months. She testified that before the hearing Loyola told her that Mother said she did not want to work with Loyola anymore. On rebuttal, Mother said she didn't want to work with Loyola because she felt Loyola lied and betrayed her on the stand. Mother did not remember telling Lee Baker that E. should not live with Grandmother.

ICWA social worker Lynette Mose is a member of the Navajo tribe. Taking into account Navajo cultural norms and child-rearing practices, Mose believed that placement with either parent was likely to result in serious physical or emotional damage. Mose believed that Mother, but not Father, received sufficient reunification services to satisfy

ICWA's active efforts requirement. She did agree that providing Father bus passes would qualify as an item of active efforts.

Mose further testified that failure to follow up on Grandmother's recent interest in custody was not in compliance with the ICWA. Mose did not speak with Grandmother because she "was informed by a previous state worker that the paternal grandmother was ruled out by the state worker." The Navajo tribe approved E.'s current placement, but continued to look for an Indian home.

Called by E.'s attorney for rebuttal, Bogatz testified that he provided bus passes and Clipper cards to both parents and made Father appointments for a psychological evaluation and substance abuse testing and assessment.

### The Court's Ruling

The court found Loyola, Zepeda, Omoragbon, Bogatz, Mose, Palmer and Baker were credible witnesses. However, it rejected Mose's definition of active efforts, and for that reason disagreed with her opinion that active efforts were not made with respect to Father.

Further, "[a]s it relates to mother's testimony, regrettably, and I don't say this lightly, but I did not find mother's testimony to be credible. When she was asked questions concerning contrary evidence, her explanations were not credible. . . . [¶] As it relates to father, regrettably the Court did not find his testimony to be credible. There was a great deal – it seems to the Court on both mother and father some degree of unionization going on, and in any event when faced with the facts as related in the various social studies reports. So I say that not easily, you know. I well appreciate how significant every one of these cases are, and in particular of course this case. But I did not find mother and father's testimony to be credible. The social studies reports are replete with mother's conduct. [¶] The Court found the logs to be particularly compelling that were introduced into evidence in this case. [¶] As it relates to the issue of reasonable and active efforts, the Court finds again and as [its] factual basis the testimony of the witnesses as well as the social studies reports that there were reasonable efforts and active efforts made in this case. . . ."

15

The court found there was no substantial probability that E. would be returned to his parents within 18 months of removal and found by clear and convincing evidence that returning him to their physical custody would risk substantial detriment to his physical and emotional well-being. Pursuant to ICWA, the court further found by clear and convincing evidence that physical custody by the parents was likely to cause E. serious emotional or physical damage and that it was beyond a reasonable doubt there was a substantial risk of emotional or physical harm were E. returned to them.

The court set a section selection and implementation hearing for June 17 and 18, 2013. Mother and Father filed separate timely writ petitions.

## DISCUSSION

### I. Probability of Return Within 18 Months

Mother contends the court should have extended her reunification period by six months because there was a substantial probability E. would be returned to her care within the maximum statutory time. She also claims the evidence was insufficient to show that placing E. with her would create a substantial risk to his safety and well-being or be likely to result in serious emotional or physical damage. Neither contention is supported by the record.

Court-ordered reunification services may be extended to a maximum of 18 months from the date a child was originally removed from a parent's custody, but only if the court finds a substantial probability that the child will be returned to the parent within the extended period or that reasonable services have not been provided. (§§ 361.5, subd. (a)(3), 366.21, subd. (g)(1).) We review the court's finding to determine whether it is supported by substantial evidence. We resolve all conflicts in the evidence in favor of the juvenile court's ruling and draw all legitimate inferences in its favor. (*E. R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) Mother has the burden to show the evidence was not sufficient to support the court's findings and order. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)

16

To find a substantial probability the child will be returned within the extended reunification period, the court must find the parent has: (1) consistently and regularly visited with the child; (2) made significant progress in resolving the problems that led to the child's removal; and (3) demonstrated the capacity and ability to complete the objectives of her treatment plan and to provide for the child's safety, protection, and physical and emotional well-being. (§ 366.21, subd. (g)(1); rule 5.715(b)(4)(A).)

Here, there was substantial evidence that Mother had not satisfied the second and third criteria for an extension of services. By the 12-month review hearing Mother demonstrated little ability to manage her worsening diabetes, leaving herself vulnerable to severe medical consequences and, as the public nurse testified, putting E.'s safety at risk. Ms. Zepeda, Mr. Omoragbon, and Ms. Loyola reported numerous occasions when mother failed to respond to E.'s cues, ignored or responded to his crying with profanity, restrained him in a car seat or walker rather than attend to his needs, and used inappropriate physical force.

Loyola was also concerned about Mother's inability to respond appropriately to E.'s cues. She testified that Mother had made little progress in this or in recognizing when she was "triggered" by the baby's behavior, and lacked the awareness she needed to meet E.'s needs, be emotionally available to him, and make him feel safe and secure. Loyola's initial optimism about reunification had disappeared by the hearing, and she no longer believed Mother could gain custody of E. within six months. Similarly, Zepeda believed Mother would continue to improve with additional services, but that it would be unrealistic to predict she could reunify within six months. While Mr. Simon was somewhat more positive about Mother's prospect to acquire the abilities she needed to care for E., he, too, agreed that this would not necessarily happen within six months. Mr. Bogatz was unequivocal that it would not. The incident reports and daily progress reports attached to the Agency's January 30 addendum report provide concrete illustrations of the concerns voiced by these multiple service providers.

It is clear that Mother loves E., and that she has made progress in addressing her volatility, regulating her emotions, and beginning to develop skills necessary to raise a

17

child. But the record also shows that her progress was intermittent and marked by the kind of setbacks that could lead the court to reasonably conclude that Mother's ability to put E.'s needs ahead of her own would never achieve permanence. Ample evidence supports the trial court's finding that Mother would not be capable of safely caring for E. if offered six more months of reunification services.

## II. Reasonable Services

Mother also disputes the court's finding that the services provided to her were adequate. An appellate court's "sole task on review is to determine whether the record discloses substantial evidence which supports the juvenile court's finding that reasonable services were provided or offered." (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.) Reasonable services aid the parent in overcoming the problems that led to the initial removal and continuing custody. (§ 366.21, subd. (f).) In reviewing whether reunification services are reasonable, we recognize that in most cases more services could have been provided, and that the services that were provided are not often perfect. (*E. R. v. Superior Court, supra,* 66 Cal.App.4th at p. 969.) The standard is not whether they were perfect, but whether they were reasonable under the circumstances. (*Ibid.*)

The evidence outlined above shows that Mother was provided with extensive services designed to address the medical, emotional, and developmental issues that impair her ability to provide E. with a safe and appropriate home. Indeed, Mother expressly concedes that "in some respect [she] had some very good services," although she raises the peculiar complaint that some of those services were "attributable. . . . to" the Regional Center rather than provided directly by the Agency—a distinction that makes no difference in assessing whether the services she was provided with were reasonable.

Indeed, Mother's main complaint seems to center upon a lack of coordination and communication among her various service providers. Specifically, she asserts the Agency should have, but did not, obtain and provide her previous psychological records to her social worker and therapists; that dyad therapy should have started sooner, lasted longer, and involved more direction from her case worker; and that neither Bogatz nor

18

Zepeda communicated adequately with her therapists. Mother also faults the Agency because her primary care doctor was a general practitioner and psychiatrist, while she now—apparently for the first time—says that an endocrinologist or internist would have been "better equipped to handle her concerns and care." Finally, Mother complains the Agency should have done more to investigate why things went downhill when her overnight visits with E. began, by "adjusting the visitation schedule, working with the dyad therapist, taking the baby to the pediatrician to assess for illness, giving the baby a chance to adjust to the new diet, and supporting the mother with services to assist with the additional stress she was feeling. . . ."

None of these alleged shortcomings indicate services were inadequate. Mother was provided with multiple, intensive means of assistance that included around-the-clock supported living; individual and dyad therapy, parenting classes and parenting coaching; psychiatric and medical care, including a visiting nurse to help her learn to manage her diabetes care; and supervised visitation. Could her services have been more ideally coordinated? Possibly. Could more have been done? Conceivably, although much was done. But perfection, as we have said before, is not the test. Mother was offered extensive support services designed to overcome the problems that led to E.'s removal from her care. Ample evidence supports the court's finding that the services provided to Mother satisfy section 366.21, subdivision (f)'s, standard of reasonableness.

### III. ICWA Compliance

#### A. *Active Efforts*

Under ICWA and California law, "[a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (25 U.S.C. § 1912(d); § 361.7, subd. (a).) Mother and Father contend there was insufficient evidence that the Agency provided such efforts. We disagree.

19

"Active efforts are essentially equivalent to reasonable efforts to provide or offer reunification services in a non-ICWA case and must likewise be tailored to the circumstances of the case." (*In re Adoption of Hannah S.* (2006) 142 Cal.App.4th 988, 998; *In re Michael G.* (1998) 63 Cal.App.4th 700, 713–714.) "What constitutes active efforts shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers." (§ 361.7, subd. (b).) Thus, "while the court must make a separate finding under section 1912(d), the standards in assessing whether 'active efforts' were made to prevent the breakup of the Indian family, and whether reasonable services under state law were provided, are essentially undifferentiable. Under the ICWA, however, the court shall also take into account 'the prevailing social and cultural conditions and way of life of the Indian child's tribe.' " (*In re Michael G.*, *supra,* 63 Cal.App.4th at p. 714; see also *In re A.A.* (2008) 167 Cal.App.4th 1292, 1317-1318; *Letitia V. v. Superior Court* (2000) 81 Cal.App.4th 1009, 1016.)

Here, whether reviewed for substantial evidence (*In re Michael G.*, *supra*, 63 Cal.App.4th at pp. 715-716) or independently to the extent the question presents a mixed question of law and fact (see *In re K.B.* (2009) 173 Cal.App.4th 1275, 1286), the record supports the court's finding that services fulfilled the ICWA requirements. As to Mother, the panoply of services discussed in relation to the reasonable services issue satisfies us that active efforts were made in compliance with the ICWA. Mother complains that the court did not expressly state the clear and convincing standard of proof in finding active efforts (see *In re Adoption of Hannah S., supra,* 142 Cal.App.4th at p. 997; 25 U.S.C. § 1912(d)), but on this record the result could have been no different under any standard.

Father received fewer services. But here, too, the record contains sufficient evidence to support the court's ruling. Father was given bus passes and Clipper cards so he could travel from his home in San Francisco to San Mateo to visit E. and access

20

services. In San Mateo he attended parent education classes and dyad therapy with Mother as well as anger management and domestic abuse classes. Father maintains he participated in these services "mostly through his own effort," but the record does not compel that conclusion, and the trial court (who explicitly found that Father's testimony was not credible) reasonably disagreed. Moreover, Father was offered additional reunification services but refused to participate in them. Mr. Bogatz scheduled three appointments for Father's psychological evaluation, at least one of which Father failed to attend and another at which he refused to sign the forms required for the evaluation. Bogatz also made at least two appointments for Father for substance abuse testing and assessment, which Father also failed to attend. Social worker Katherine Odle made additional referrals for assessment and testing. The record supports the court's determination that active efforts were made as to both parents.

## B. *Placement Preferences*

Mother and Father contend the evidence does not support the finding of good cause to deviate from the ICWA's preference that a child be placed with an Indian caregiver. Here, too, the record belies their position.

Absent good cause to the contrary, ICWA "mandates that adoptive placements be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indian families. [Citation.] 25 United States Code section 1915(b) states a similar preference for any Indian child accepted for foster care or preadoptive placement, in the absence of good cause to the contrary. In this way, ICWA seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society. [Citation.] [¶] Although Congress defined numerous terms for ICWA purposes at the outset of the act (see 25 U.S.C. § 1903), it did not define the phrase 'good cause' as used in 25 United States Code section 1915 (Section 1915). Nevertheless, according to ICWA's legislative history, Congress, by its use of the term 'good cause,' explicitly intended to provide state courts with flexibility in determining the placement of an Indian child. [Citations.]"

21

(*Fresno County Dept. of Children and Family Services v. Superior Court* (2004) 122 Cal.App.4th 626, 641 (hereafter *Fresno County*); see § 361.31.)

In California, guidance on the meaning of "good cause" is provided by statute and rule of court. Section 361.31, subdivision (h) authorizes the juvenile court to depart from the ICWA placement preferences for good cause.[4] Rule 5.484(b)(2) provides a non-exclusive list of factors relevant to the determination of good cause. It states: "The court may deviate from the preference order only for good cause, which may include the following considerations: (A) The requests of the parent or Indian custodian; (B) The requests of the Indian child, when of sufficient age; (C) The extraordinary physical or emotional needs of the Indian child as established by a qualified expert witness; or (D) The unavailability of suitable families based on a documented diligent effort to identify families meeting the preference criteria." As indicated by the permissive language, the court is not limited to the enumerated considerations when it evaluates whether good cause exists to place a child with a non-Indian caregiver. (*Fresno County, supra*, 122 Cal.App.4th at pp. 643-644.)

The good cause finding is reviewed for substantial evidence, so our review "begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. [Citation.] All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the decision, if possible. We may not reweigh or express an independent judgment on the evidence. [Citation.] In this regard, issues of fact and credibility are matters for the trial court alone." (*Fresno County, supra,* 122 Cal.App.4th at p. 646.)

---

[4] "The court may determine that good cause exists not to follow placement preferences applicable under subdivision (b), (c), or (d) in accordance with subdivision (e)." (§ 361.31, subd. (h).) Subdivision (e) directs that, "[w]here appropriate, the placement preference of the Indian child, when of sufficient age, or parent shall be considered."

The good cause finding here is supported by substantial evidence. Ms. Mose's testimony establishes that ongoing efforts were being made through the Navajo Children and Family Services to find an Indian family to care for E., although none had been located by the conclusion of the twelve month review hearing. As to the suggestion that he could be placed with Grandmother, there was ample evidence she was not a suitable caretaker. Father early on told the Agency that his mother, in her 70's and suffering from diabetes and hip problems, was not capable of caring for the baby. Moreover, the Agency was understandably unwilling to place E. in the same home as Father, whose continuing bouts of intoxication were among the reasons E. was initially detained. Finally, the court was also entitled to take into account Mother's repeated statements, up until the last minute, that she did not want E. to live with Grandmother. (See § 361.31, subd. (e); rule 5.484(b)(2)(A).) On this record, the court properly found there was good cause to depart from the ICWA's preference for an Indian placement.

## C. *Standard of Proof*

Finally, Mother asserts the court stated the wrong standard of proof when it found under the ICWA that continued custody by the Indian parent is likely to result in serious emotional or physical damage to the child. (25 U.S.C. § 1912(f); § 366.26, subd. (c)(2)(B).) Mother correctly points out that the court must make this finding beyond a reasonable doubt, and that its oral and written ruling instead cites the clear and convincing evidence standard. But while the court cited the wrong standard, two points independently convince us its error does not warrant reversal.

First, the court also, and immediately, proceeded to find "beyond a reasonable doubt that there is a substantial risk of emotional or physical harm if the child returns to the custody of the parents." Mother argues this finding is inadequate because the court did not specify that the risk of harm was *serious*, but the argument is meritless. Considering the extensive and consistent problems of roughness and neglect chronicled by Mother's service providers in conjunction with Ms. Mose's testimony that custody by either parent was likely to result in serious physical or emotional damage, there is no reasonable probability here that the court could have determined the harm risked by

23

leaving 15-month old E. in Mother's care was less than "serious." (See *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218 [failure to make findings regarding minor's change of custody deemed harmless where it is not reasonably probable the finding would have been in favor of continued parental custody].)

Second, and in any event, section 1912(f) of the ICWA requires only that the risk of harm finding be made before the court terminates parental rights. While the finding may and generally is made at the referral hearing, it need not be. As explained in *In re Matthew Z.* (2000) 80 Cal.App.4th 545, 554-555, "[t]he finding generally should be made at the final review hearing at which a section 366.26 hearing is scheduled. If this finding was made, a court need not readdress the issue at the section 366.26 hearing, unless the parent presents evidence of changed circumstances or shows the finding was stale because the period between the referral hearing and the section 366.26 hearing was substantially longer than the 120-day statutory period. *On the other hand, if the ICWA section 1912(f) finding was not made at the final review hearing and the court intends to terminate parental rights, the ICWA section 1912(f) finding must be made at the section 366.26 hearing.*" (Italics added.) The court in this case will have the opportunity to revisit this finding at the section 366.26 hearing, so the omission of an express section 1912(f) finding beyond a reasonable doubt at the referral hearing presents no basis for reversal.

## DISPOSITION

The order to show cause is discharged, and the petitions for extraordinary writ are denied on the merits. (See § 366.26, subd. (*l*); *In re Julie S.* (1996) 48 Cal.App.4th 988, 990-991.) Our decision is final immediately. (rules 8.452(i) & 8.490(b).)

24

_____
Siggins, J.

We concur:


_____
McGuiness, P.J.


_____
Jenkins, J.