Filed 2/28/14  In re K.G. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.G., a Person Coming Under the Juvenile Court Law. | |
| DEL NORTE COUNTY DEPARTMENT OF HEALTH AND SOCIAL SERVICES,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>W.F.,<br><br>      Defendant and Appellant. | A138756<br><br>(Del Norte County<br>Super. Ct. No. JVSQ11-6079) |

W.F. (Father) challenges orders selecting guardianship as the permanent plan for his daughter, K.G., and related letters of guardianship.  Father's main argument is that the court erroneously failed to determine which of two Indian tribes was K.G.'s tribe for purposes of this case.  Father and K.G. are enrolled members of the Yurok Tribe.  K.G.'s mother, K.M.G. (Mother), is an enrolled member of the Karuk Tribe, and K.G. would be eligible through Mother for enrollment in the Karuk Tribe.  But the Yurok Tribe is K.G.'s tribe, and the Yurok have been actively involved throughout K.G.'s case.  Father's other contentions are also without merit.  We affirm the orders for K.G.'s permanent plan and the letters of guardianship issued to effectuate the plan.

# I. BACKGROUND

K.G. was four years old and her half-sister, A.F. (Sister), was six years old when they were detained in May of 2011. Sister is Mother's biological daughter, and is an enrolled member of the Karuk tribe. According to the dependency petition, K.G. and Sister were living with Father and A.B. (for convenience, hereafter Stepmother) when Stepmother brought K.G. to the Del Norte County Department of Health and Social Services (Department) on May 16, 2011, and said that she and Father "just can't keep the girls." Stepmother told the Department that K.G. was saying that Father was "coming into her bed after mommy's asleep," and that "[Father] and his friends are touching her." Father and Stepmother had repeatedly requested that Sister be removed from their care. According to the detention report, there had been "problems with [Sister] inappropriately (sexually) touching [K.G.]." The report indicated that Sister had lived with Mother until July of 2007, and there were allegations that Sister had been sexually molested while in Mother's care. The petition stated that Mother's whereabouts at the time of detention were unknown. The report stated that Karuk Tribe representative Mike Edward had been contacted and was to attempt to locate Mother.

At the May 19, 2011 detention hearing, Father stated that he was K.G.'s biological father and Sister's "guardian." When asked whether the children had relatives who were willing and able to care for them, Father mentioned their maternal grandmother (Grandmother). Yurok Tribe social worker Dana Taylor said the tribe was exploring possible placement. Taylor said that the Yurok Tribe would be intervening in K.G.'s case, and that the Karuk Tribe would be intervening in Sister's case. Father and Taylor said they were satisfied for the time being with the children in separate foster homes.

On May 27, the Yurok Tribe filed a notice of intervention in K.G.'s case, and a jurisdictional hearing in both children's cases was set for June 17. The Yurok and Karuk Tribes were notified of the hearing.

The Department's jurisdiction report stated that Father was given physical custody of K.G. and Sister in December 2009. The record contains a December 7, 2009 judgment in a Siskiyou County dependency case for the children, which terminated jurisdiction and

placed them in Father's custody. The report noted that "[K.G.] is a member of the Yurok Tribe and the tribe is formally intervening as a party. [¶] [Sister] is an enrolled member of the Karuk Tribe. . . . [T]he tribe is planning to intervene and has been involved in locating a relative for placement approval."[1] The Department recommended that K.G. be continued in foster care, and that Sister be placed with Grandmother. The Department was "collaborating with the Karuk and Yurok Tribal Social Services." The tribes were "in agreement with the children remaining detained in out of home care," and the Karuk Tribe was completing relative approval paperwork for Grandmother's home.

At the June 17 hearing for K.G. and Sister, Yurok social worker Taylor said that she was "present in the matter of K.G." No representative of the Karuk Tribe appeared. Taylor said that she could supervise Father's visitation with K.G. and Sister, and the Department's social worker stated that Karuk social worker Edwards was assessing relative placements for Sister.[2] The court asked Taylor whether the tribes were coordinating their efforts for the children. Taylor said that "the Yurok Tribe hasn't *been able to locate a placement, an ICWA placement* for [K.G.] at this time. We had one in the works but it fell through, so definitely that's something we want to do is talk to the Karuk Tribe and try to coordinate something so they can maintain a relationship."[3] The jurisdictional hearing for the children was continued to June 24.

Father's work prevented him from attending the June 24 hearing. Yurok social worker Taylor was personally present, and Karuk social worker Edwards appeared by telephone. Edwards said that he was appearing as a representative of the Karuk Tribe in Sister's case. Edwards reported on his investigation of a placement for Sister with Grandmother. Taylor said that she had supervised Father and Stepmother's visit with

---

[1] Father quotes the report's language about the Karuk Tribe's plan to intervene as if it pertained to K.G., but that paragraph in the report concerned Sister, not K.G.

[2] Father's opening brief incorrectly states that the Yurok Tribe was assessing relative placements for Sister.

[3] Father's opening brief incorrectly attributes the italicized statements to a "Karuk tribal representative."

3

K.G. and Sister that week, and that the family had interacted well.  The hearing was continued to July 14.

No tribal representatives were present at the July 14 hearing.  Father testified that K.G. was claiming that "we" and "a friend that was coming over" were touching her.  He immediately contacted the Yurok Tribe when K.G. made these false allegations, as he had taken custody of K.G. and Sister after they were abused by Mother's friends.  He tried "[t]o protect them from each other because the older one [Sister] started to touch the younger one [K.G.]," and he acknowledged that he needed help with the children's mental health.  The hearing was put over to the following day to determine when a tribal representative could be present.  The next day, Yurok representative Taylor appeared personally, Karuk representative Edwards was contacted by phone, and the jurisdictional hearing was continued to August 18.

Taylor and another representative of the Yurok Tribe appeared at the August 18 hearing.  The court proceeded in the absence of the Karuk Tribe, because it was the tribe's "obligation to call here."  After hearing testimony from Father and Department case workers, and argument from counsel for Father, the Department, and K.G. and Sister, the court sustained the dependency petition's allegations under Welfare and Institutions Code section 300, subdivision (b)[4] of failure to protect the children.  The court denied Yurok representative Taylor's request that Father be granted unsupervised visitation, and set the dispositional hearing for September 9.

The Department's dispositional report advised that K.G. was in a foster home and that Sister was on an extended visit with Father.  The report stated that the "Department has provided the family with case management services, meetings with the Yurok and Karuk Tribes to discuss what the family needs to be successful in having the children returned to their home. . . . The Department has had at least twice per month conversations with both the Yurok Tribe and Karuk Tribe to discuss a case plan and family progress."  The Department recommended that the children be declared

---

[4] Unless otherwise indicated, subsequent statutory references are to this code.

4

dependents, that Sister be placed with Father, and that K.G. remain in foster care. Father said he was "afraid that if [K.G.] is returned to his home prior to her being in counseling services for a period of time that the allegations she made regarding him coming into her room at night will begin again. [Father] stated that he 'does not want to go to prison for something he did not do.'" "The Department, Yurok Tribe, Karuk Tribe and [Father] believe[d] that [K.G.] needs to be attending counseling on a regular basis to address her behavior before it would be safe to return her to the home. . . . [Father] denies entering [K.G.'s] room at night and just wants to protect himself, [Sister] and his home from false accusations."

The Yurok and Karuk Tribes were notified of the September 9 dispositional hearing. At the hearing, the Department social worker noted that "[Sister] is Karuk. [K.G.] is Yurok," and the court observed that "Yurok representatives [were] present for [K.G.]." The Department social worker stated: "Our recommendation is for [Sister] to be at home under family maintenance and do family reunification for [K.G.]. The Yurok Tribe and Karuk Tribe are in agreement with those recommendations." The hearing was continued to September 16, for preparation of an Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) report by Yurok tribal member Richard England.

On September 16, the court once again confirmed with the Department social worker that K.G. was Yurok and Sister was Karuk. Yurok representatives were present, and Karuk representative Edwards was contacted by telephone. Sister was declared a dependent in Father's custody. When Sister's disposition was concluded, the phone call with Edwards ended. K.G.'s disposition was continued to October 7, pending receipt of England's ICWA report.

England filed his report on September 21. He wrote: "Growing up in our homeland, close to our river and ceremonies is very important for our children in both the Yurok and Karuk communities. Both tribes come from the Klamath River and we are very similar and share many of the same traditions, values, and mores." He was "in agreement with the Yurok Tribe, the Karuk Tribe, and the [Department] in terms of the

5

current plan. . . . The current plan that places [K.G.] in a foster care placement is creative, appropriate and good for the needs of the family."

Taylor appeared on behalf of the Yurok tribe when K.G.'s dispositional hearing was concluded on October 7. She said that, "unfortunately," no tribal home was available. With the agreement of all present, K.G. was declared a dependent and continued in foster care. A six-month review hearing was set for March 9, 2012.

The Department filed a status review report on February 28, 2012. The report said that the Department had one phone conversation with Mother, but was "unable to assess her ability to parent [K.G.] or [Sister]." The Department recommended that K.G. remain a dependent, and that Father and Mother receive six more months of family reunification services. K.G. had no contact with Mother, and one visit with Father since the day after Christmas. The Department recommended that dependency be terminated for Sister, who continued to reside with Father. Notice of the March 9 hearing was given to the Yurok Tribe.

A "tribal member representative" appeared at the March 9 hearing. The transcript reads: "The Court: . . . I didn't realize that [Sister] was Karuk and [K.G.'s] Yurok. [¶] Are you here for both? [¶] Tribal Member Representative: I'm sitting in for our ICWA, so I am not sure. I know I'm here for [K.G.]. [¶] [Department] Social Worker Farren: Just [K.G.] . . . . [¶] The Court: Okay. . . . " The court terminated dependency for Sister, continued K.G. in foster care, and set a 12-month review for July 20.

The Department's report for the July 20 hearing recommended that reunification services be terminated for Father and Mother and that a section 366.26 (hereafter .26) hearing be set to select a permanent plan for K.G. The report stated that K.G. was an enrolled member of the Yurok Tribe, but eligible through Mother for enrollment in the Karuk Tribe. The report observed that the Yurok Tribe had been involved in K.G.'s case since her detention. The Department had "staffed this case two times per month with the Yurok Tribe during Tribal Multi Disciplinary Team meetings." The Yurok Tribe told the Department that "they [did] not have a tribal home for [K.G.] to be placed in at this time." The Department could not determine whether K.G. could be safely placed with

6

Grandmother because the building where Grandmother lived was being remodeled and the handyman doing the work refused to be fingerprinted. The Department arranged a forensic interview of K.G. by a Del Norte County sheriff's detective, who found no proof of molestation based on her statements. Father stated that he would be out of town until November doing seasonal work as a logger, and by that time K.G. would have been in foster care for 18 months. Mother was homeless and had no money to take care of K.G.

Mother appeared at the July 20 hearing, along with representatives of the Yurok Tribe. Mother was appointed counsel, and filed notices of her mailing address and her membership in the Karuk Tribe. The hearing was continued to August 3. Yurok Tribe representatives were present on August 3, and Father and Mother were represented by counsel at the hearing. The Yurok Tribe's attorney stated that the tribe was in favor of further reunification services for Father, and Mother's counsel argued that notices to her in the case had been sent to the wrong address. The hearing was continued to August 17. On August 17, Father appeared with counsel, Mother was represented by counsel, and Yurok tribal representatives were present. Mother's counsel requested that she receive a case plan, and reiterated the argument that she had not received proper notices. The Yurok Tribe's counsel requested a contested hearing on termination of services to Father. The hearing was continued to August 30.

Yurok tribal representatives, Father with counsel, and Mother's counsel were present at the continued 12-month review on August 30. Social worker Cindy Farren testified that Father had found work closer to home and would be more easily able to have visitation with K.G. She said that K.G.'s unsupervised visits with Father and Stepmother ended when K.G. "once again said people were touching her" after a visit on May 5. When law enforcement investigated those statements, K.G. told the officer she said them only because Sister told her to and she did not want to get Sister in trouble. Farren stated: "Do I think [Father] is doing anything? I don't think so. Do I think [K.G.] is lying about everything? I don't think so either." Farren said that Stepmother reported seeing Sister touch K. G. before the dependency petitions were filed. Father was called as a witness by counsel for the Yurok Tribe. Father first said that he wanted K.G.

7

returned to his custody, then said that he did not want any overnight visits with her, and then said "I'm willing to go forward and try it again."

Before the August 30 hearing, the Yurok Tribe advocated that K.G. be returned to Father's custody and, as has been noted, the Department's report recommended that reunification services be terminated. By the end of the hearing, all agreed to six more months of reunification services, and an interim review hearing was scheduled for November 16. The court appointed Gail Narum to conduct a forensic interview with K.G.

The Department filed Narum's report on November 15. K.G.'s foster mother, M.S. (Foster Mother; M.S. and her husband S.S. are hereafter referred to collectively as Foster Parents), told Narum that K.G.'s early behavioral problems in the foster home included "violent tantrums serveral times a day, repeatedly hurting animals and her younger foster sister, overeating and taking food, and lying." K.G. was also observed rubbing her four-year-old foster sister's vaginal area with a washcloth during a bath. However, her problematic behavior had improved. Foster Mother had not seen any sexual behavior from K.G. in six months, K.G. had not hurt her younger foster sister in six months, and had not hurt an animal in three months. In a follow-up interview two months later, the Foster Mother said that K.G. had not exhibited sexual behavior or complained about anyone sexually touching her.

Narum wrote: "At this point it is likely we will never know with any degree of certainty whether [K.G.] was molested. Further questioning [of K.G.] will be unproductive . . . ." K.G.'s other behavioral problems such as aggression and "disordered eating" were "commonly reported in children with a history of neglect, family adversity and disruption, and/or exposure to interparental physical abuse." Narum opined: "[K.G.] needs stability and consistency in her life. Her current foster placement appears to be meeting these needs quite well, and a disruption would likely cause detriment and regression. [¶] . . . [¶] It would be detrimental for [K.G.'s] emerging sense of identity and self-esteem to lose her cultural heritage. I recommend contacting the Yurok and

Karuk tribes to request their assistance in teaching [K.G.] and including her in traditional activities."

The Department's report for the November 16 hearing recommended termination of reunification services and setting of a .26 hearing. The report stated that Father had only one visit with K.G., and had not called her at the foster home, since the August 30 hearing. The Department "believe[d] that [Father] has made his decision about having [K.G.] returned to his home by his lack of contact with the child." The goal of the Department's proposed case plan was "to maintain [K.G.] in her current foster home and to work with the Yurok Tribe to select a permanent plan for [K.G.]." The case plan required Foster Parents to "ensure that [K.G.] is allowed to participate in Yurok Tribe activities and maintain the connection with her tribe in order to learn the customs and culture of the Yurok Tribe."

Yurok Tribe representatives and counsel for Father and Mother appeared on November 16. Counsel for the tribe said the tribe agreed with the Department's recommendation. Counsel said the tribe appreciated the case plan provision for consultation between the Department and the tribe on the permanent plan, and "look[ed] forward to continuing that relationship." Counsel "recommend[ed] contacting the Yurok and Karuk Tribes to request their assistance in including [K.G.] in traditional culture." The hearing was continued to November 30 to give Father's counsel further opportunity to contact his client.

The November 30 hearing was attended by counsel for Father and Mother, and an individual identified in the transcript as a "tribal member representative." The tribal representative agreed with terminating services and establishing a guardianship. Father appeared during the hearing, in the words of his counsel, "extremely upset and heartbroken. [¶] He loves his daughter very much, but he understands that it's probably best for her. He wants what's best for her to remain where she's at, because she can continue to get services. [¶] He understands if she's brought home, at some point that may not continue, and it's probably best the two children are, frankly, kept apart." The case was taken off calendar to correct the notice provided to Mother. Father, Mother,

9

Foster Mother, and the Yurok Tribe were given notice of a continued status review hearing on December 28. Father, Father's counsel, and Mother's counsel appeared on December 28. The Yurok Tribe did not appear and the hearing was continued to January 11, 2013.

Father, Father's counsel, Mother's counsel, and a Yurok Tribe social worker appeared on January 11. Father and the tribe remained in agreement with the Department's recommendation that services be terminated. Father's counsel said he had been advised that Father's sister had expressed an interest in custody of K.G. Father told that court that the sister, C.S. (Aunt), "would love to have that child." Father said that he and Aunt "had discussions as long as this is going on what would be best for my daughter . . . ." The social workers for the Department and the Yurok Tribe were previously unaware of any potential for placement of K.G. with Father's family. The tribe's social worker said that she would "have to do a home evaluation [of Aunt] and those kind of things." The court terminated reunification services to Father and Mother, and set a .26 hearing for May 10.

The Department's report for the .26 hearing recommended that K.G. remain a dependent and that guardianship with Foster Parents be selected as K.G.'s permanent plan. The report once again noted that K.G. was a member of the Yurok Tribe, and that the tribe had been actively involved throughout her case. The Department stated: "[Foster Mother] has contact information for [Yurok tribal representative] Rich England in order to find out which activities [K.G.] can attend that are designed for her age through the Yurok Tribe. [Foster Mother] has taken [K.G.] to Northern California Indian Development Counsel to obtain information on the Yurok Tribe in order to ensure that [K.G.] continues to learn about her Native American Culture. [¶] [Foster Parents] have demonstrated their willingness to allow [K.G.] to continue to have visits with her immediate and extended family in order for [K.G.] to maintain the connection with her biological family, which will also help [her] stay connected to her Native American culture and her tribe." The Foster Parents were "willing to keep dependency open as long as the Department, the Yurok Tribe and the Court will require it to be open."

10

The report stated that K.G. had three visits with Aunt since March 11. Prior to their first visit, K.G. met Aunt only once and did not remember her. Aunt told the Yurok Tribe that she wanted K.G. placed in her home in Oregon, but the Department and the tribe agreed that the move would be detrimental to K.G. The case plan provided that Aunt would continue to visit with K.G. once per month, and continue to call K.G. once per week. The plan also provided for visitation with Father and Sister. The Department lodged an adoption assessment by the state Department of Social Services, which concurred with the guardianship plan recommended by the Department and the Yurok Tribe.

Mother and Father appeared with counsel, and Aunt and Yurok tribal representatives were present, at the .26 hearing. The tribe's counsel noted that placement with Aunt would ordinarily be preferred under ICWA over placement with Foster Parents, who are not Native American. However, the tribe believed that "the Court does have good cause to keep the placement as is in that the aunt has had very limited contact with the child." Counsel said the tribe was "hoping that over time . . . our position might change," and Father's counsel argued that K.G.'s relationship with Aunt should be allowed to develop "[p]rior to any permanent decision." The court responded, "I want to make clear . . . this is considered a permanent guardianship, although guardianships by their very nature are not permanent like an adoption. This is not a temporary guardianship."

Counsel for K.G., who had been present for her throughout the case, argued for stability and for continued placement with Foster Parents. After the court rejected Father's renewed request to postpone a permanent plan for K.G. pending development of her relationship with Aunt, counsel for the tribe stated "that the Court would be selecting a permanent plan of guardianship. It's not selecting a guardian, necessarily." After Mother argued for placement of K.G. with Aunt, but "not right now," the court said, "Okay. And I'm not making a permanent decision. As [Yurok counsel] pointed out, this is a guardianship that we're choosing. I'm not choosing a permanent guardian, per se."

11

Aunt addressed the court, saying, "I told [Father] I was on board if [K.G.] needed to have a home. It now is too late. She is in the system, and my heart is broke because I have offered that help to him." The court told Aunt, "I am very sorry that you weren't involved earlier. I look at the father as . . . taking a big part of the responsibility for that."

The court ordered that K.G. remain a dependent, placed her in "a permanent plan of legal guardianship with [Foster Parents]," and set a six-month post-permanency review hearing for November 8. The court adopted the case plan, and asked whether further provisions should be made for visitation with Aunt. Aunt requested two visits per month, and the Department's counsel questioned whether two visits were feasible given the Foster Parents' family activities. The court asked Foster Parents and Aunt to "[w]ork together and be flexible." Foster Mother and Aunt assured the court that that they would be able to agree on a visitation schedule, and the Department's counsel said, "I can work it out."

The court filed orders after the May 10 hearing stating that "any and all visitation will be at the discretion of the Legal Guardians." Letters of guardianship for Foster Parents were issued on May 17.

The May 20, 2013 notice of appeal referred only to the May 10, 2013 orders selecting guardianship as the permanent plan, but we grant Father's request to construe the notice to also encompass the May 17, 2013 letters of guardianship, which are part of the appellate record. (*In re Joshua S.* (2007) 41 Cal.4th 261, 272 [notices of appeal are liberally construed].)

## II. DISCUSSION

A. <u>Failure to Identify K.G.'s Tribe</u>

Section 224.1, subdivision (e) provides: "If an Indian child is a member of more than one tribe or is eligible for membership in more than one tribe, the court shall make a determination, in writing together with the reasons for it, as to which tribe is the Indian child's tribe for purposes of the Indian child custody proceeding." (See also Fam. Code, § 170, subd. (d) [same].) Section 224.1, subdivision (e)(2) specifies the factors that govern determination of which tribe has "the more significant contacts" with the child

when the child is "a member of more than one tribe, or . . . is eligible for membership in more than one tribe." These factors include the "[i]nterest asserted by each tribe in response to the notice specified in Section 224.2." (§ 224.1, subd. (e)(2)(G).) Section 224.2, subdivision (a)(3) directs that notice "be sent to all tribes of which the child may be a member or eligible for membership, until the court makes a determination as to which tribe is the child's tribe in accordance with subdivision (d) [*sic*; the intended reference is to subdivision (e)] of Section 224.1, after which notice need only be sent to the tribe determined to be the Indian child's tribe."

ICWA likewise provides for notice to "the Indian child's tribe" (25 U.S.C. § 1912(a)), and defines "Indian child's tribe" to mean "(a) the Indian tribe in which an Indian child is a member or eligible for membership or (b), in the case of an Indian child who is a member of or eligible for membership in more than one tribe, the Indian tribe with which the Indian child has the more significant contacts . . . ." (25 U.S.C. § 1903(5).)

Father contends that the court erred because it did not determine which tribe—the Yurok or the Karuk—was K.G.'s tribe for purposes of this case. According to Father, the court should have made the written determination required by section 224.1, subdivision (e), applying the factors set forth in section 224.1, subdivision (e)(2). Father contends that other errors "cascaded" from this "fatal preliminary error." The "subsequent errors [included] the fact that the court overlooked or acquiesced in the Karuk Tribe's non-attendance at critical junctures in [K.G.'s] case (jurisdiction, disposition, and the 366.26 hearing), because the court was under the mistaken impression that the Yurok Tribe had been legally 'determined' to be '[K.G.'s] tribe' for purposes of the ICWA."[5] The Karuk

_____

[5] According to Father's brief, this "mistaken impression" is reflected on page 133 of the reporters transcript, the first page of the transcript of the September 16, 2011 hearing at which Sister's disposition was concluded. But Judge Weir, who presided at the hearing, simply asked "[K.G.] is Yurok and [Sister] is Karuk; is that correct?" and social worker Farren simply responded, "Correct." Given the children's recognized memberships in the respective tribes, this exchange did not establish that any "legal determination" of their tribal affiliations had occurred. We note also that Judge Brown

13

Tribe was "effectively deprived of the intended benefits of the notice provisions of the ICWA." "Had the Karuk Tribe been present [at the .26 hearing] to express an opinion, and had it not been effectively discouraged from participating by having been incorrectly informed months before that the court had made a legal determination that [K.G.] was Yurok not Karuk, the Karuk Tribe might well have preferred placement with [Aunt] which was within the ICWA placement preferences." "The Karuk Tribe might even have advocated, at that point, for a tribal customary adoption . . . and sought a continuance to permit assessment of [Aunt]."

These arguments are all untenable. Failure to make a formal finding that the Yurok Tribe was K.G.'s tribe was unnecessary because from the outset the Yurok Tribe took the lead in K.G.'s case, and the Karuk Tribe took the lead in Sister's case. When Sister's disposition was concluded, the Karuk Tribe literally hung up the phone.

Moreover, no prejudice or other error followed from any failure to make the finding Father claims was necessary. Father is mistaken about the applicability of the section 224.1, subdivision (e)(2) factors in selecting between the tribes. According to the record, K.G. is an enrolled member of the Yurok Tribe and eligible for membership in the Karuk Tribe. Consequently, the controlling subdivision of section 224.1 is not (e)(2) but rather (e)(1), which states: "If the Indian child is or becomes a member of only one tribe, that tribe shall be designated as the Indian child's tribe, even though the child is eligible for membership in another tribe." (See also Guidelines for State Courts; Indian Child Custody Proceedings (44 Fed.Reg. 67584 et seq. (Nov. 26, 1979) Guideline B.2 [stating the same rule under ICWA].) "[ICWA] itself and the legislative history make it clear that tribal rights are to be based on the existence of a political relationship between the family and the tribe. For that reason, the guidelines make actual tribal membership of the child conclusive on this issue." (*Id.* at com. to Guideline B.2.)

_____

previously presided at the hearing where jurisdiction was found, and Judge Follett subsequently presided at the .26 hearing. Thus, Father has not shown that any "mistaken impression" about a "legal determination" was shared by "the court" in general.

14

Since the Yurok Tribe was K.G.'s tribe as a matter of law in this case, there is no merit to Father's arguments about lack of notice to the Karuk Tribe (§ 224.2, subd. (a) [requiring notice to "the minor's tribe"]; 25 U.S.C. § 1912(a) [same]), and his speculation about what might have transpired had the Karuk Tribe been more involved is misplaced. Nor do we find any support in the record for Father's allegation that the Karuk Tribe was discouraged from participating.[6]

B.  Good Cause For Denying a Preferred Placement

ICWA provides that "[i]n any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." (25 U.S.C. § 1915(a); see also § 361.31, subds. (b), (h).)  Although this ICWA provision refers only to "adoptive" placements, it applies equally to guardianships.  (*In re N.M.* (2009) 174 Cal.App.4th 328, 334, fn. 6.)  Under this statute, placement of K.G. with Aunt was preferred over placement with Foster Parents.  Father contends that the court lacked good cause to deviate from this preference.

"In reviewing the court's good cause determination to bypass ICWA's placement preferences, we apply the substantial evidence test."  (*In re G.L.* (2009) 177 Cal.App.4th 683, 697.)  "[A]ccording to ICWA's legislative history, Congress, by its use of the term 'good cause,' explicitly intended to provide state courts with flexibility in determining the placement of an Indian child."  (*Fresno County Dept. of Children & Family Services v. Superior Court* (2004) 122 Cal.App.4th 626, 641.)  Relevant considerations include "[t]he extraordinary physical or emotional needs of the Indian child as established by a qualified expert witness" (Cal. Rules of Court, rule 5.484(b)(2)(C)), and "the suitability

---

[6] Father does not identify where in the record the Karuk Tribe was "incorrectly informed months before [the .26 hearing] that the court had made a legal determination that [K.G.] was Yurok not Karuk."  If Father is referring to the question asked by Judge Weir at the September 16, 2011 hearing, the question could not have supplied "information" to the Karuk Tribe because the Karuk tribal representative was not contacted by telephone until after the question was asked.

15

of the persons preferred for placement" (*In re Alicia S.* (1998) 65 Cal.App.4th 79, 89).

Here, the court had received the Narum report detailing K.G.'s difficulties and progress in foster care, and its opinion that a disruption of the foster placement "would likely cause detriment and regression." Father delayed bringing Aunt into the case, and K.G. had just begun getting to know her before the .26 hearing. The Yurok Tribe agreed that K.G.'s placement with Aunt at the time of the .26 hearing was inadvisable. There was substantial evidence to support a finding of good cause that K.G. remain in the care of Foster Parents.

C. Other Issues

Father complains that the court said at the .26 hearing that it was "not choosing a permanent guardian, per se," but then "immediately proceeded to order [K.G.] 'placed in a permanent plan of legal guardianship with [Foster Parents]' . . . and then issued letters of guardianship to [Foster Parents] a week later without holding another hearing . . . ." But Father did not object at the hearing when the court announced a permanent plan of guardianship with Foster Parents because that was clearly how the court was intending to rule, notwithstanding its earlier comment about not choosing a "permanent guardian." In context, that comment was simply an observation that a guardianship is not set in stone, and can be terminated, or modified by a petition for appointment of a successor guardian. (See, e.g., *In re S.H.* (2011) 197 Cal.App.4th 1542, 1553; Cal. Rules of Court, rule 5.740(c).) Father has no basis to contest issuance of the letters of guardianship because Foster Parents required the letters in order to perform their obligations as guardians. (See, e.g., Cal. Guardianship Practice (Cont.Ed.Bar 2013) § 5.84, p. 268 [letters are used, among other things, to obtain schooling and health care for minors].)

Father observes that the visitation order filed after the .26 hearing provided that all visitation would be at the discretion of Foster Parents. But Father is incorrect in claiming that the court made no provision "for any visitation for Indian relatives." The court adopted a case plan that provided for visitation with Father, Sister, and Aunt. Foster Parents, Aunt, and the Department pledged at the .26 hearing to work out a visitation schedule. Father's concerns about potential problems with visitation are not substantiated

in the record.  The court continued the dependency and Father had recourse if problems developed.

### III.  DISPOSITION

The permanent plan orders and letters of guardianship are affirmed.

_____
Siggins, J.

We concur:


_____
McGuiness, P.J.


_____
Pollak, J.